RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

HEATHER SPEES,

      *Plaintiff-Appellant,*

    *v.*

JAMES MARINE, INC. and JAMESBUILT, LLC,
      *Defendants-Appellees.*

No. 09-5839

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 08-00073—Thomas B. Russell, Chief District Judge.

Argued: April 28, 2010

Decided and Filed: August 10, 2010

Before: CLAY and GILMAN, Circuit Judges; ZATKOFF, District Judge.[*]

_____

## COUNSEL

**ARGUED:** D. Wes Sullenger, SULLENGER LAW OFFICE, PLLC, Paducah, Kentucky, for Appellant. David L. Kelly, DENTON & KEULER, LLP, Paducah, Kentucky, for Appellees. **ON BRIEF:** D. Wes Sullenger, SULLENGER LAW OFFICE, PLLC, Paducah, Kentucky, for Appellant. David L. Kelly, DENTON & KEULER, LLP, Paducah, Kentucky, for Appellees.

    GILMAN, J., delivered the opinion of the court, in which CLAY, J., joined. ZATKOFF, D. J. (pp. 27-30), delivered a separate opinion concurring in part and dissenting in part.

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Shortly after being employed as a welder for James Marine, Inc. (JMI), Heather Spees discovered that she was pregnant. At the direction of her foreman, Spees obtained a note from her physician restricting her to light-duty work, which resulted in JMI reassigning her to a position in the company's tool room. JMI terminated Spees two months later when a second doctor placed her on bedrest for the duration of her pregnancy. Spees then sued JMI and its subsidiary, JamesBuilt, LLC, seeking relief for (among other things) pregnancy and disability discrimination.

The district court granted summary judgment in favor of JMI and JamesBuilt on these claims, which Spees now challenges on appeal. For the following reasons, we **AFFIRM** the judgment of the district court with regard to Spees's pregnancy-discrimination claim and her disability-discrimination claim as they pertain to the termination of her employment, **REVERSE** the district court's grant of summary judgment on Spees's pregnancy-discrimination claim and disability-discrimination claim to the extent that they are based on her reassignment to the tool room, and **REMAND** the case for further proceedings on these latter two claims.

## I. BACKGROUND

### A.    Factual background

JMI owns and operates a construction and repair facility for inland waterway vessels on the banks of the Tennessee River near Calvert City, Kentucky. On May 11, 2007, Spees was hired to work at JMI's JamesBuilt facility, which focuses largely on constructing deck and tank barges, towboats, and dry-docks for the river-shipping industry. JamesBuilt, LLC is a subsidiary of JMI, and the two share the same Human Resources Department. (For convenience, JMI and JamesBuilt are hereinafter collectively referred to as JMI.)

Despite having no prior experience working in a manual-labor position, Spees was hired by JMI as a welder. Spees, like other newly hired welders without welding experience, was required by JMI to complete a 30-day in-house training course. She successfully completed the training program and was promoted to a welder-trainee position in early June 2007.

At this point in time, JMI's 935 nonoffice positions were overwhelmingly male, with only four of these positions filled by female employees. Spees was the only female assigned to the JamesBuilt facility.

Welding work at the JamesBuilt facility is physically demanding. It requires heavy lifting, climbing up ladders and stairs, maneuvering into barge tanks, and, occasionally, the overhead handling of equipment. The summer of 2007 was also particularly hot, with temperatures reaching 100 degrees Fahrenheit or more on multiple occasions.

In addition, welders are exposed to fumes, dust, and organic vapors in the course of their work. To limit the inhalation of these substances, JMI provides welders with respirators to wear while on the job. Spees was fitted with a respirator during orientation, although she often opted not to wear it once she became a welder because she "didn't feel like [she] needed one."

Tony Milam, Spees's foreman, described her as "a good employee" and "a good welder," and he "ribbed" other male employees about "her coming in there and welding as good as what she done." Spees enjoyed her work and believed that her supervisors saw her as "a good employee" and "a hardworking employee."

Shortly after she started working at JMI, Spees became pregnant. This was Spees's third pregnancy; she had given birth to a daughter in 1999 and had suffered a miscarriage in 2005. Fearing that the pregnancy would cause her to lose her job, Spees was "hysterical" when she became aware of her condition. By this point, Spees was roughly five to six weeks' pregnant.

Spees's first course of action was to telephone her brother, Christopher Gunder, who was a JMI foreman. Gunder, in turn, recommended that she call Milam. While talking to Milam, Spees expressed her concern that she would be terminated from her position due to the pregnancy. Milam responded by noting that he "had concerns about her being around the chemicals, the welding smoke, [and] climbing around on some of the jobs" while pregnant, and he told her to see a doctor to "find out exactly what she did or didn't need to be doing or be around."

On June 19, 2007, the day following her telephone conversation with Milam, Spees saw Dr. Jorge Cardenas, an obstetrician in Paducah, Kentucky. Dr. Cardenas had been Spees's physician for a number of years, including when she had suffered her miscarriage two years earlier. During her appointment with Dr. Cardenas, Spees discussed her past miscarriage and described her job duties as a welder. Dr. Cardenas replied that "there was no problem" with Spees resuming her work as a welder while pregnant. Although Dr. Cardenas did not know of any health problems that welding fumes could pose for a fetus, he recommended that Spees wear a respirator while working. At the end of her appointment, Spees received a "Certificate to Return to Work" from Dr. Cardenas that did not list any restrictions on her ability to weld.

Spees left her appointment with the intent of returning to work that same day. On her way back to JMI, she called Milam to inform him that she had received clearance from Dr. Cardenas to resume welding. Milam, in the meantime, had discussed with his supervisor Kenneth Colbert the possibility of moving Spees to a nonwelding "light-duty" position. He therefore asked Spees to read him Dr. Cardenas's Certificate to Return to Work. Despite Dr. Cardenas's having cleared Spees to work, Milam believed, based on "common sense," that "there was some questions about her being pregnant and being able to safely perform the job that she was required to do." Milam's concerns were also in part driven by the fact that Spees "had complications with other pregnancies before."

Spees testified that, upon hearing her read Dr. Cardenas's note, Milam told Spees that she "needed something more descriptive or else they were going to get rid" of her. According to Spees, Milam requested that she obtain a second note from Dr. Cardenas

mentioning "toxic fumes" and limiting her to "light duty." Milam told Spees that such a note would help her get a transfer to a position in the tool room, thereby allowing her to retain her employment with JMI during her pregnancy.

At Milam's direction, Spees returned to Dr. Cardenas that same day to ask for a second note that limited her to light duty. Dr. Cardenas, complying with her request, wrote her a work order that read "patient requires light duty & avoid [sic] toxic fumes." He testified that although there was no medical reason to limit Spees's job duties, he wrote the note "to allay some of [Spees]'s concerns" and "for the purpose of reducing her anxiety." According to Dr. Cardenas, Spees did not inform him that her superiors at JMI had requested that the note be written.

Spees returned to JMI and showed Milam the second note from Dr. Cardenas that limited her to light duty. Milam informed Spees that he had consulted further with Colbert and that they had already decided that Spees could no longer weld. He did, however, tell Spees that she could work in the tool room, noting that "for right now, we don't know what to do with you." Milam believed that the transfer would be temporary and that Spees could resume welding after the pregnancy. Despite voicing her desire to continue welding, Spees accepted the change.

Gunder also participated in the decision to reassign Spees to the tool room. He testified that, while JMI was deliberating where Spees should be working, he and Milam "went to [Colbert], and we just decided that it wouldn't be a good idea for her to [weld]." Gunder added that he was motivated by concern for the health of his sister's unborn child, and he believed that the job duties of a welder—the "constant[] dragging [and] pulling" as well as inhaling the welding fumes—should not be performed by Spees while pregnant.

Spees began working in the tool room on June 20, 2007, the day after she visited Dr. Cardenas. Her primary duties in that capacity were to dispense tools to other employees and to ensure that none of the equipment was lost or stolen. Spees found the job to be as physically demanding as welding, with the working conditions being "just as hot," and her having to lift the same tools and materials as she did when welding. The

main difference was that she did not have to perform any overhead work while in the tool room. Spees received the same salary for her work in the tool room as she did when welding.

Shortly after she began working in the tool room, Spees encountered Tom Freeman, the head of JMI's Safety Department, to whom she had never before spoken. According to Spees, Freeman told her that working at JMI "was not women's work" and that she needed to go back to her doctor to ask for a "descriptive note." He added that the descriptive note should specify "everything you can and cannot do," including whether Spees could climb ladders, lift heavy objects, and work in the heat. Freeman then told Spees that "I am your boss," and "I am requesting this." When Spees noted that she had already submitted a work order from Dr. Cardenas, Freeman told her the note "wasn't good enough" and that she "needed to understand that this [is] a man's world."

Freeman's comments upset Spees, causing her to seek out Milam in his office. Milam, upon hearing about Freeman's remarks, told her "I'm your boss. They are trying to fire you. Do not waste your time. I have already been told by [Colbert] that you are not going to weld no matter what your doctor is going to do." He later reprimanded Freeman for his comments to Spees.

Spees worked the daytime shift in the tool room for approximately one week. This assignment was temporary in nature and was made to give JMI time to "get everything straightened out" regarding Spees's pregnancy. Milam then informed Spees that there was a night-shift position available in the tool room, indicating that such a transfer would allow her to maintain her employment with JMI during the pregnancy.

Acting on this information, Spees went to see Pam DeWeese, an employee in JMI's Human Resources Department. Spees thought that the schedule change would be difficult given her status as a single mother, but she also believed that the change was necessary in order to keep her job. During their conversation, Chad Walker, the Human Resources Director, stopped by DeWeese's office and told Spees that he could fire her because she was not injured at work, but that he was going to work with her and allow

her to work in the evening. Following Spees's conversation with DeWeese and Walker, the change in shifts was approved and Spees began working nights. Gunder, Spees's brother, was the night foreman at JMI.

Spees worked the night shift in the tool room without incident for approximately one month. But in early August 2007, temperatures in Calvert City reached 106 degrees Fahrenheit, and Spees was experiencing significant swelling due to the heat. She also had vomited on multiple occasions while commuting to work. Spees again visited Dr. Cardenas, who wrote her a note stating that she should take off one week from work due to the heat.

Milam and another manager with JMI knew of the problems that Spees was experiencing and encouraged her to "go on some medical leave." At this point, Spees transferred her medical care from Dr. Cardenas to Dr. Susan Mueller, another obstetrician in Paducah. Spees had an appointment with Dr. Mueller on August 16, 2007 and, during this visit, Dr. Mueller discovered that Spees had an "incompetent cervix." (An incompetent cervix, according to www.medterms.com, is a cervix that is "abnormally liable to dilate and so is not competent to keep the fetus up in the uterus and keep it from being spontaneously aborted.") In light of this complication, Dr. Mueller placed Spees on bedrest for the remainder of her pregnancy and wrote her a note to that effect. Spees did not request to be placed on bedrest nor did she inform Dr. Mueller that her supervisor had encouraged her to go on medical leave. Although Dr. Mueller believed that Spees was not physically capable of doing her job, Spees disagreed and thought that she could have continued working. Spees nevertheless submitted Dr. Mueller's note to Gunder.

At this point, Spees had been absent from work for more than 14 days due to her various doctors' appointments and the one-week rest recommended by Dr. Cardenas. Because Spees had not yet worked 90 days for JMI, she was entitled to only two weeks of approved leave and was not eligible for leave at all under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 1611 *et seq.* Gunder, who was aware that Spees had exhausted her leave, called DeWeese to discuss what to do. DeWeese told Gunder to

terminate Spees. She further instructed Gunder to note in Spees's termination paperwork that the company would rehire her after her baby was born.

Gunder called Spees to tell her about the termination. Spees was surprised by her firing, having believed that she would be placed on long-term medical leave. According to Spees, Gunder told her that she "was being fired for being pregnant." Spees further contends that Gunder failed to tell her that she would be rehired following the conclusion of her pregnancy.

Gunder filled out Spees's termination form. It stated that "Dr. put Heather off work until after her delivery date. Not enough time in for [medical leave of absence]. Rehire after delivery." Despite this statement on the form, Spees did not know until after taking legal action against JMI that the company intended to rehire her following the pregnancy.

## B.    Procedural background

Spees filed suit against JMI in April 2008, alleging unlawful discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and under the Kentucky Civil Rights Act (KCRA), Ky. Rev. Stat. Ann. § 344.010 *et seq.* Her claims included (1) pregnancy discrimination on the basis of her transfer to the tool-room position, (2) pregnancy discrimination on the basis of her termination, and (3) disability discrimination. Spees also brought disparate-treatment and disparate-impact gender-discrimination claims on the basis of allegedly inferior women's restroom and locker facilities at JamesBuilt, but neither of these claims is raised by Spees on appeal.

Following discovery, Spees filed a motion for summary judgment on all of her claims as to JMI's liability. JMI then responded to Spees's motion and filed its own counter-motion for summary judgment. The district court granted summary judgment in favor of JMI on Spees's pregnancy-discrimination and disability-discrimination claims. Regarding Spees's tool-room transfer claim, the court concluded that Spees's

reassignment did not constitute an adverse employment action. It similarly determined that Spees could not succeed on her job-termination claim because she could not show that JMI's justification for firing her—Dr. Mueller's note placing her on bedrest and the fact that she had exhausted her medical leave—was a pretext designed to mask discrimination. Finally, the court was not persuaded that pregnancy constituted a disability for ADA purposes and, accordingly, granted summary judgment in favor of JMI on Spees's disability-discrimination claim.

The remaining two claims of disparate-treatment and disparate-impact gender discrimination—based on the allegedly inferior restroom and locker facilities for women—were tried to a jury, which found in favor of JMI on both claims. Spees now appeals the district court's grant of summary judgment in favor of JMI on her claims of pregnancy discrimination and disability discrimination.

## II.  ANALYSIS

### A.      Standard of review

We review de novo a district court's grant of summary judgment. *ACLU of Ky. v. Grayson County*, 591 F.3d 837, 843 (6th Cir. 2010). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, we must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.      Standard for pregnancy-discrimination claims

Spees contends that JMI discriminated against her on the basis of her pregnancy on two separate occasions: (1) when she was transferred to work in the tool room, and (2) when she was terminated. The district court concluded that Spees had failed to make out a prima facie case of discrimination on the first claim because the tool-room transfer

was not deemed an adverse employment action. It further determined that, although Spees established a prima facie case of discrimination regarding her termination, she was unable to show that JMI's proffered justification for the firing—Dr. Mueller's note restricting Spees to bedrest and Spees's exhaustion of her medical leave—was pretextual. The court thus granted summary judgment to JMI on both claims.

Spees brought her pregnancy-discrimination claims pursuant to Title VII and the KCRA. Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). "Because of sex" as used in Title VII includes "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). "[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.*

The KCRA likewise prohibits discrimination against pregnant women. *See* Ky. Rev. Stat. §§ 344.030(8), 344.040(1). And the KCRA is "similar to Title VII of the 1964 federal Civil Rights Act and should be interpreted consistently with federal law." *Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 797-98 (Ky. 2000); *see also Jefferson County v. Zaring*, 91 S.W.3d 583, 586 (Ky. 2002) (observing that because "the provisions of the KCRA are virtually identical to those of the Federal act[,] . . . in this particular area we must consider the way the Federal act has been interpreted" (citation and internal quotation marks omitted)).

As an initial matter, we must determine the proper analytical framework to apply to Spees's pregnancy-discrimination claims at the summary judgment stage of the case. The district court analyzed both claims pursuant to the burden-shifting framework first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), as amended by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981). Under that familiar tripartite analysis, a plaintiff seeking to survive summary judgment on a Title VII claim must overcome the following hurdles:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252-53 (citations omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. at 253.

Subsequent cases, however, have held that a different standard applies to so-called "mixed-motive" claims. Such claims are based on the plaintiff's allegation that "race, color, religion, sex, or national origin was *a* motivating factor for any employment practice, even though other factors also motivated the practice." Title VII, 42 U.S.C. § 2000e-2(m) (emphasis added). Allegations of discriminatory conduct thus fall into one of two categories: single-motive claims, "where an illegitimate reason motivated an employment decision," or mixed-motive claims, "where both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008).

This court in *White* held that the *McDonnell Douglas/Burdine* framework does not apply to mixed-motive claims. *Id*. at 400. Instead, "a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was *a* motivating factor for the defendant's adverse employment action." *Id*. (emphasis in original) (citation and internal quotation marks omitted). The plaintiff's burden of producing evidence to support a mixed-motive claim "is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id*.

Although portions of the *McDonnell Douglas/Burdine* framework might be "useful" in presenting a mixed-motive claim, the *White* court made clear that "compliance with the . . . shifting burdens of production is *not* required in order to demonstrate that the defendant's adverse employment action was motivated in part by a consideration of the plaintiff's race, color, religion, sex, or national origin." *Id.* at 401 (emphasis in original) (citation and internal quotation marks omitted). The "ultimate question" in a mixed-motive analysis is simply "whether there are any genuine issues of material fact concerning the defendant's motivation for its adverse employment decision, and, if none are present, whether the law . . . supports a judgment in favor of the moving party on the basis of the undisputed facts." *Id.* at 402. Inquiries into what motivated an employer's decision "are very fact intensive" and "will generally be difficult to determine at the summary judgment stage." *Id.* (citation omitted).

This relatively lenient summary judgment standard is counterbalanced by potential restrictions on a plaintiff's recovery for a mixed-motive claim. Under Title VII, a plaintiff asserting a mixed-motive claim is entitled only to declaratory relief, limited injunctive relief, and attorney fees and costs where the employer demonstrates that it would have taken the same employment action in the absence of an impermissible motivating factor. 42 U.S.C. § 2000e-5(g)(2)(B).

Plaintiffs must give proper notice when bringing mixed-motive claims. *Hashem-Younes v. Danou Enters. Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009) (affirming the district court's application of the *McDonnell Douglas/Burdine* framework where the plaintiff failed to raise a mixed-motive claim in her complaint or in her response to the defendants' summary judgment motion, and the record was "utterly silent as to mixed motives"). Spees provided such notice of her mixed-motive claims in the district court. As stated in her complaint, both discrimination claims alleged that Spees's pregnancy "was *a* motivating factor in [JMI]'s treatment of her." (Emphasis added.) She also specified in a footnote to her motion for summary judgment that she was bringing mixed-motive claims and was using the *McDonnell Douglas/Burdine* framework in her motion only because of uncertainty regarding the proper analysis of mixed-motive

claims on a *plaintiff*'s motion for summary judgment.  Finally, Spees reiterated that she was pursuing mixed-motive claims under Title VII in her reply in support of her motion for summary judgment/response to JMI's motion for summary judgment.  We therefore conclude that Spees provided adequate notice of her mixed-motive claims.

In light of this notice, the district court's failure to apply the *White* analytical framework was in error.  To properly analyze Spees's claims, we need determine only whether JMI took an adverse employment action against Spees and whether her pregnancy was a motivating factor for the adverse action.  *See White*, 533 F.3d at 400. Each of Spees's claims is addressed below with the *White* framework in mind.

**C.      Pregnancy-discrimination claim based on Spees's transfer to the tool room**

Spees first claims that JMI discriminated against her by transferring her to a tool-room position once it learned of her pregnancy.  The district court granted JMI's motion for summary judgment on this claim, finding that the transfer did not constitute an adverse employment action.

### 1.      *The transfer as an adverse employment action*

An adverse employment action has been defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment."  *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted).  A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action.  *Id*. at 797.  Adverse employment actions are typically marked by a "significant change in employment status," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Reassignments and position transfers can qualify as adverse employment actions, particularly where they are accompanied by "salary or work hour changes."  *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996) (holding that a job transfer was not an adverse employment action because the plaintiff "enjoyed the same

. . . rate of pay and benefits, and her duties were not materially modified"). And even if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 886 (citation omitted).

Upon learning that Spees was pregnant, JMI transferred her from a daytime welding position to a daytime position in the tool room, where she worked for approximately one week before being transferred to a nighttime shift in order to keep her job. Some evidence indicates that the transfer was not a materially adverse change in her employment. For instance, Spees received the same salary while working in the tool room and did not lose any of her benefits. And, as JMI points out in its brief, the working conditions in the tool room were in some ways better than those while welding. JMI contends, for example, that the summer heat was more tolerable in the tool room because Spees could wear two fewer pieces of gear than when welding, and JMI provided a small fan for Spees's personal use. Spees was also not subject to the toxic fumes from welding while working in the tool room.

But the record contains other evidence to suggest that Spees's transfer was a materially adverse change. In many ways, the tool-room transfer can be seen as a demotion. Spees was required to complete a 30-day training course to become a welder, but there is no evidence that a tool-room position required any specific training or skill. In addition, Spees appears to have felt unchallenged by her tool-room position, testifying that she found it to be "more boring" than welding. This contrast weighs in favor of finding the change in job assignments to be materially adverse. *See White v. Burlington N.*, 364 F.3d at 803 (concluding that an employee's transfer from a forklift operator to a standard railroad track laborer job was an adverse employment action because, in part, "the forklift operator position required more qualifications, which is an indication of prestige").

Moreover, Spees was soon assigned to the night shift, which adversely affected her ability to raise her daughter as a single mother. An "inconvenience resulting from a less favorable schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged." *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008) (holding that switching police officers to a rotating morning/afternoon/night shift from a permanent night shift was an adverse employment action because it "severely affected their sleep schedules and made it more difficult for them to work overtime and part-time day jobs"). Although Spees did not describe in detail how the schedule change affected her, she did state that she "wasn't happy" about transferring to nights because she was a single mother. And the fact that Spees "requested" the night-shift position does not diminish JMI's responsibility for the schedule change because Spees was constructively forced to work nights. Both Milam and Spees testified that Milam told her to pursue the night-shift because it was the only option available that would allow her to retain her employment with JMI. This evidence supports the conclusion that she suffered an adverse employment action.

Nor does the evidence conclusively indicate that the tool-room position was a more pleasant working environment. Spees testified that working in the tool room was "just as hot" and as "physically demanding" as welding, the only difference being that she did not need to do any overhead handling of the welding equipment. And although Spees was not exposed to toxic fumes while working in the tool room, she could have avoided such fumes by wearing a respirator while welding, as first recommended by Dr. Cardenas.

On balance, Spees's transfer to the tool room resulted in her working a more inconvenient shift in a position that was less challenging and that required fewer qualifications. Viewing this evidence collectively in Spees's favor, a reasonable jury could find that her transfer to the tool room constituted an adverse employment action.

### 2.      *Spees's pregnancy as a motivating factor for the transfer*

We must next determine whether Spees presented sufficient evidence from which a reasonable jury could find that her pregnancy was a motivating factor in transferring her to the tool room. In *International Union, UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991), the Supreme Court set forth the parameters regarding the acceptable treatment of female employees with childbearing capacity. Johnson Controls had barred all fertile females from its lead-battery plant out of concern for the health of the fetuses that the women might conceive. *Id.* at 191-92. The Court struck down the company's policy as violating Title VII because the policy discriminated against female employees based on their capacity to become pregnant, even though the employees' "reproductive potential" did not prevent them from being able to perform their jobs. *Id.* at 206. It added that an employer's safety concerns were a permissible ground for restricting a female employee's job opportunities only where a pregnancy "actually interfere[d] with the employee's ability to perform the job." *Id.* at 204. The Court concluded that "Congress made clear that the decision to become pregnant or to work while being . . . pregnant . . . was reserved for each individual woman to make for herself." *Id.* at 206.

In the present case, Spees presented considerable evidence demonstrating that her pregnancy was at least *a* motivating factor, if not *the* motivating factor, in JMI's decision to transfer her to the tool room. Milam testified that when he first learned of Spees's pregnancy, he had "concerns" that she would not be able to weld. When Spees read him Dr. Cardenas's first note clearing her to return to welding, Milam said that "there was some question about her being pregnant and being able to safely perform the job that she was required to do." He based these concerns on his perception of "common sense." And according to Spees, Milam told her to obtain a second note from Dr. Cardenas limiting her to light duty and instructing her to avoid toxic fumes. JMI then relied on this note in transferring Spees to the tool room.

Other JMI employees superior to Spees exhibited a similar attitude. Tom Freeman, the head of JMI's Safety Department, told Spees that "this is a man's world" and that the notes from Dr. Cardenas were "not acceptable." Freeman's statement that

he "didn't know what he was going to do" with Spees could be construed as further questioning her ability to weld while pregnant. Gunder, the night foreman and Spees's brother, also partook in the decision to transfer Spees. He stated in his deposition that he did not want Spees welding "because she was carrying my niece." Gunder and Milam discussed where Spees should be working, and they "just decided that it wouldn't be a good idea for her to [weld]." In contrast, Spees never told her supervisors at JMI that she was unable to weld. She instead believed that she could weld, with only minimal restrictions, up until the full term of her pregnancy.

Furthermore, there is no evidence to suggest that Spees requested a transfer to the tool room. Milam, on the other hand, knew that there was a night-shift opening in the tool room and recommended that Spees seek a transfer. He and other managers made the decision to move Spees to the tool room, allegedly telling her "we don't know what to do with you." In addition, Milam later indicated to Spees that JMI management had taken unilateral action. According to Spees, Milam informed her that "I have already been told by [Colbert] that you are not going to weld no matter what your doctor is going to do."

JMI defends its decision to transfer Spees by relying on Dr. Cardenas's second note that restricts Spees to light duty and indicates that she should avoid toxic fumes. The company also points to Dr. Cardenas's testimony in which he states that his recommendations were independent of any motivations that JMI may have had. But this evidence does not shield JMI's transfer decision in light of Milam's apparent opinion that Spees should be transferred even before Dr. Cardenas had written the light-duty note. Furthermore, Spees testified that Milam instructed her to obtain the note so limiting her. Dr. Cardenas's statement that he was not influenced by JMI when writing the second note is similarly inconclusive because Spees might have chosen not to inform him (or forgotten to inform him) that she was seeking that note at JMI's request. In sum, evidence exists from which a reasonable jury could find that JMI had decided that Spees was unable to weld due to her pregnancy and had instructed her to get a doctor's note to that effect.

JMI also argues that it would have been subject to a tort claim for negligence if it had permitted Spees to continue welding contrary to the orders contained in Dr. Cardenas's second note. But this argument again overlooks the evidence that Milam told Spees to obtain the restrictive note in the first place. Moreover, as the Supreme Court noted in *Johnson Controls*, JMI's risk of tort liability in this situation would be remote if it "fully inform[ed]" Spees of the risk inherent to welding while pregnant and did not otherwise act negligently. *See id.* at 208. Summary judgment is accordingly inappropriate on this ground.

As a whole, the evidence is sufficient to raise a genuine issue of material fact as to whether JMI management, rather than undertaking an objective evaluation to determine whether Spees could perform her welding job while pregnant, instead subjectively viewed Spees's pregnancy as rendering her unable to weld. This would allow a reasonable jury to find that JMI's decision to transfer Spees was made out of concern for her pregnancy and the well-being of her unborn child rather than because Spees was unable to perform her job as a welder. Such concerns, though laudatory, do not justify an adverse employment action. *See id.* at 206. The district court therefore erred in granting summary judgment in favor of JMI on Spees's transfer claim.

### D.        Pregnancy-discrimination claim based on Spees's termination

In addition to alleging that JMI violated the antidiscrimination laws in transferring her to work in the tool room, Spees contends that JMI discriminated against her by terminating her employment after she was placed on bedrest. This claim is also a mixed-motive claim, so Spees must show that she was subject to an adverse employment action for which her pregnancy was a motivating factor. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008). JMI concedes the obvious—that firing an employee constitutes an adverse employment action. *See, e.g.*, *id.* at 402. And, to be sure, Spees's pregnancy played a role in her termination, with complications stemming from the pregnancy causing Spees to be placed on bedrest, which in turn led to her firing due to the fact that she had exhausted all of her available medical leave. But the *White* analysis does not hinge on whether Spees's pregnancy was

a link in the chain of events that resulted in her firing. Rather, *White* directs us to examine whether there is evidence that JMI was *motivated* by Spees's pregnancy in making its decision to terminate her.

JMI's justifies its termination decision by pointing to the fact that Spees presented it with Dr. Mueller's note placing Spees on bedrest. Unlike the note from Dr. Cardenas, which Spees claims was obtained at the direction of Milam in order to restrict her to light-duty work, there is no evidence that JMI influenced Dr. Mueller's writing Spees the bedrest note. This restriction instead stemmed from Dr. Mueller's diagnosis of Spees's incompetent-cervix medical condition. Dr. Mueller's assessment was also arrived at independently of any request by Spees, who testified that she neither asked to be placed on bedrest nor told Dr. Mueller that JMI had told her to seek medical leave.

Pursuant to the bedrest note from Dr. Mueller, Spees was unable to work in any capacity at JMI, a point that Spees herself recognizes. Spees also acknowledges that although she would have been placed on medical leave under normal circumstances, she was not eligible for FMLA leave as a recently hired employee who had already exhausted all of the regular leave to which she was entitled. JMI's decision to terminate Spees was thus based on a combination of her being unable to work and her lack of any available medical leave, not upon her pregnancy per se.

But Spees maintains that she would not have submitted the bedrest note from Dr. Mueller to JMI if she had known that she was ineligible for any additional medical leave. She adds that she would have preferred to continue working in defiance of Dr. Mueller's advice. But there is no evidence that Spees resisted being placed on bedrest. To the contrary, it was Spees who submitted the bedrest note to JMI. Spees argues that she did so only because she had been encouraged to "go on some medical leave," but she also conceded in her deposition that no one at JMI guaranteed her that she was eligible for such leave. Her reliance on any expectation of medical leave was therefore unjustified.

In short, absent any evidence that JMI played a role in having Spees placed on bedrest—the event that directly led to her termination—there is no support for Spees's contention that her pregnancy in and of itself was a motivation behind JMI's decision to fire her. Without the bedrest note, the record supports the conclusion that JMI would have allowed Spees to continue working in the tool room despite being pregnant. Spees was terminated, in other words, not because she was pregnant, but because she voluntarily submitted to JMI the bedrest note advising her not to work for the duration of her pregnancy. We therefore conclude that summary judgment was proper on this claim.

**E.      Disability claim based on Spees's transfer to the tool room**

Spees next appeals the entry of summary judgment for JMI on her claim that the company prohibited her from welding and transferred her to a tool-room position because it wrongfully perceived her pregnancy to be a disability. The ADA prohibits discrimination by a covered entity "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To make out a prima facie case of discrimination under the ADA, a plaintiff must show "(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (citation omitted). "The third element requires that the plaintiff suffer an adverse employment action." *Id*.

In this case, the central dispute over Spees's ADA claim revolves around whether she meets the definition of a "disabled" person. A "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (2006). This section of the Act was amended in 2009, subsequent to the events giving rise to Spees's lawsuit.

But we must analyze Spees's claims pursuant to the earlier version (provided above) because the amendments to the ADA do not apply retroactively. *See Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 567 (6th Cir. 2009) (holding that "the ADA Amendments Act does not apply to pre-amendment conduct").

Spees does not argue that her pregnancy qualified as a disability under subsections (A) or (B); rather, she brings her claim pursuant to the "regarded-as" provision in subsection (C). Moreover, Spees acknowledges that pregnancy, by itself, does not constitute a disability under the ADA and thus cannot form the basis of a regarded-as claim. This concession comports with the unanimous holdings of the federal courts that have addressed the issue. *See, e.g.*, *Richards v. City of Topeka*, 173 F.3d 1247, 1250 n.2 (10th Cir. 1999) ("[W]e do note that numerous district courts have concluded that a normal pregnancy without complications is not a disability under 42 U.S.C. § 12102(2)(A).") (listing cases); *Navarro Pomares v. Pfizer Corp.*, 97 F. Supp. 2d 208, 212 n.5 (D.P.R. 2000) (observing that the only district judge to have held that pregnancy, by itself, was a disability under the ADA reversed himself in a subsequent case), *rev'd on other grounds*, *Navarro v. Pfizer Corp.*, 261 F.3d 90 (1st Cir. 2001). Likewise, the interpretive guideline for the term "disability" issued by the Equal Employment Opportunity Commission in its Compliance Manual excludes pregnancy from its definition of disability. EEOCCM § 902.2(c)(3), 2009 WL 4782107 (Nov. 21, 2009) ("Because pregnancy is not the result of a physiological disorder, it is not an impairment.").

Spees's ADA claim instead hinges on her contention that JMI erroneously perceived her to be disabled "based on her history of conditions with a previous pregnancy." This type of claim exists where "(1) an employer mistakenly believes that an employee has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more of an employee's major life activities." *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (brackets and citation omitted). "Either application requires that the employer entertain misperceptions about the employee."

*Id.* (brackets, citation, and internal quotation marks omitted).  Spees has not alleged that she suffered an actual impairment, so she therefore must show that JMI mistakenly regarded her as having "a physical or mental impairment that substantially limit[ed] one or more of [her] major life activities."  *See* 42 U.S.C. § 12102(2) (2006).

Our first step in evaluating Spees's ADA claim is to determine whether her prior miscarriage, or a potentially higher risk of having a future miscarriage, could constitute an impairment.  Whereas no court has held that pregnancy by itself is an impairment under the ADA, many district courts have held that pregnancy-related conditions can qualify as such.  *See, e.g.*, *Navarro*, 261 F.3d at 97 ("While pregnancy itself may not be an impairment, the decided ADA cases tend to classify complications resulting from pregnancy as impairments.").  The EEOC interpretive guidelines also recognize that pregnancy-related conditions can constitute impairments under the ADA.  EEOCCM § 902.2(c)(3), 2009 WL 4782107 (Nov. 21, 2009) ("Complications resulting from pregnancy . . . are impairments.").

Pregnancy-related conditions have typically been found to be impairments where they are not part of a "normal" pregnancy.  *See Serednyj v. Beverly Healthcare LLC*, No. 2:08-CV-4 RM, 2010 WL 1568606, at *14 (N.D. Ind. Apr. 16, 2010) (surveying cases and noting that "only abnormal complications might qualify as impairments" under the ADA).  Susceptibility to a miscarriage, moreover, has been deemed by some courts to be such a condition.  *See Cerrato v. Durham*, 941 F. Supp. 388, 393 (S.D.N.Y. 1996) (adopting the American Medical Association's Council on Scientific Affairs' conclusion that a "threatened . . . miscarriage" is a "substantial complication" not part of an "entirely normal, healthy pregnancy"); *Soodman v. Wildman, Harrold, Allen & Dixon*, No. 95 C 3834, 1997 WL 106257, at *6 (N.D. Ill. Feb. 10, 1997) (holding that "the inability or significantly impaired ability to carry a viable fetus to term is . . . a 'substantial impairment'" under the ADA).

Although other courts have held that pregnancy complications related to miscarriages are not disabilities, the analysis in those cases did not hinge on the question of whether there was an impairment, but rather on whether the condition was sufficiently

severe to substantially limit a major life activity.  *See, e.g.*, *Lacoparra v. Pergament Home Ctrs.*, 982 F. Supp. 213, 228 (S.D.N.Y. 1997) (concluding that the plaintiff's "history of infertility" and prior miscarriage were not disabilities where the "evidence suggests that, if anything, the existence and impact of the complications were temporary"), *overruled on other grounds by Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 724 (2d Cir. 2001).  There thus appears to be a general consensus that an increased risk of having a miscarriage at a minimum constitutes an impairment falling outside the range of a normal pregnancy.

In the present case, there is evidence that JMI regarded Spees as having an impairment.  Milam testified that because Spees had experienced "complications with other pregnancies before," he thought that she should not be working, and he had "concerns about her being around the chemicals, the welding smoke, [and] climbing around on some of the jobs."  This statement suggests that Milam believed Spees to be especially sensitive to miscarriages in light of the fact that she had experienced one in the past.  Milam's testimony therefore constitutes evidence that JMI perceived Spees as having an impairment.

Spees must next show that JMI viewed her impairment as substantially limiting a major life activity.  The only major life activity Spees points to is that of working.  A claim that an employer perceived an employee as being unable to work requires "proof that the employer regarded the employee as significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes."  *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 704 (6th Cir. 2008) (citation and internal quotation marks omitted).  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  *Id.* (citation omitted).

In evaluating this issue, the regulations accompanying the ADA direct us to consider certain factors.  These factors include those used to determine whether an impairment substantially limits any major life activity, namely:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(J)(2). The regulations further provide three additional factors where, as here, the major life activity is working:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii).

In the present case, the evidence supports the conclusion that the tool-room transfer precluded Spees from working in "a class of jobs" for two reasons. First, JMI viewed Spees as being unable to weld in any capacity, thereby precluding her from employing the skills that she had acquired during the one-month training program for welding. The tool-room position, unlike a welding position, did not require any special training, meaning that Spees was effectively removed to an unskilled position and precluded from utilizing any of the welding training that she had received. JMI's belief that Spees could not perform any type of welding work thus weighs in favor of concluding that she was precluded from working in a class of jobs. *Cf. Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir. 1995) (holding that a plaintiff was not precluded from working in a class of jobs where an arm injury restricted her from performing any climbing while welding, but did not prevent her from welding in general).

The second reason supporting the conclusion that JMI prevented Spees from working in a class of jobs is the fact that it restricted her to light-duty work. In this regard, we are persuaded by the EEOC Compliance Manual, which states, as an example of an employee being unable to work in a class of jobs, that "a charging party is substantially limited in working if (s)he has a back impairment that precludes him/her from heavy lifting and, therefore, from the class of heavy labor jobs." EEOCCM § 902.4(c)(3)(ii), 2009 WL 4782109 (Nov. 21, 2009). This dividing line between light-duty and medium- or heavy-duty work for purposes of determining what constitutes a class of jobs has also been previously recognized by this court. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 652 (6th Cir. 2001) (denying summary judgment on an ADA claim where the employer perceived an employee "as unable to perform anything but 'light duty' work, and [] perceived that medium to heavy manual labor constituted a majority of the jobs available to her").

Here, JMI put Spees on light-duty work immediately upon learning that she was pregnant. Milam was instrumental in transferring Spees to the tool room, going so far as to instruct Spees to obtain a note from Dr. Cardenas restricting her to light-duty work even though Dr. Cardenas had already cleared her to return to welding. And although Spees testified that she found the tool-room work to be as physically demanding as welding, both parties clearly considered it to be light-duty work. The light-duty nature of the tool-room work, viewed in conjunction with the fact that the tool-room position did not utilize any of the skills that Spees had acquired as a result of her welder training, supports the determination that JMI precluded Spees from working in a class of jobs. We therefore conclude that the first element of Spees's prima facie ADA claim based on the tool-room transfer has been met.

Moreover, Spees has satisfied the remaining two elements of this claim. One of these elements hinges on whether she was qualified to weld, with or without reasonable accommodation. Spees fulfilled this element by presenting considerable evidence, none of which is disputed by JMI, that she successfully completed the training course for welding and performed competently as a welder prior to being transferred to the tool

room. And the final element has likewise been met because, as discussed in Part III.C.1. above, the tool-room transfer constituted an adverse employment action. The district court therefore erred in granting summary judgment in favor of JMI on Spees's ADA claim to the extent it is based on the tool-room transfer.

**F.      Disability claim based on Spees's termination**

Spees's final challenge is to the grant of summary judgment in favor of JMI on her ADA claim with regard to the termination of her employment. But Spees has presented no evidence that JMI regarded her as having an impairment that precluded her from working in the tool room. Rather, as discussed above in Part III.D. above, JMI's decision was based on Dr. Mueller's note—obtained independently of any influence by JMI—that restricted Spees to bedrest for the duration of her pregnancy. Spees thus cannot show that JMI's decision to terminate her stemmed from a mistaken belief that she suffered an impairment precluding her ability to work in general.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court with regard to Spees's pregnancy-discrimination claim and her disability-discrimination claim as they pertain to the termination of her employment, **REVERSE** the district court's grant of summary judgment on Spees's pregnancy-discrimination claim and disability-discrimination claim to the extent that they are based on her reassignment to the tool room, and **REMAND** the case for further proceedings on these latter two claims.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

ZATKOFF, District Judge, Concurring in Part and Dissenting in Part. I concur with the factual description, analysis and conclusions set forth in Sections I., II.A., II.B., II.D. and II.F of Judge Gilman's opinion. As such, I join with my colleagues in affirming the district court's judgment with regard to Spees's pregnancy-discrimination claim and her disability-discrimination claim as they pertain to the termination of her employment. I disagree, however, that Spees suffered an adverse employment action when she was transferred to the tool room. Accordingly, I write separately and respectfully dissent from the majority's decision to reverse the district court's judgment on Spees's pregnancy-discrimination and her disability-discrimination claims as they pertain to her transfer to the tool room.

As stated by the majority in Section II.C.1.:

> An adverse employment action has been defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted). A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action. *Id.* at 797. Adverse employment actions are typically marked by a "significant change in employment status," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

> Reassignments and position transfers can qualify as adverse employment actions, particularly where they are accompanied by "salary or work hour changes." *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996) (holding that a job transfer was not an adverse employment action because the plaintiff "enjoyed the same . . . rate of pay and benefits, and her duties were not materially modified"). And even if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received "a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices that might be unique to a particular situation." *Id*. at 886 (citation omitted).

The majority also recognizes that "[t]he third element [of a disability-discrimination claim] requires that a plaintiff suffer an adverse employment action." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).

I find the foregoing recitation of the law accurate and applicable in this case, just as I agree with the majority's conclusion that:

> Some evidence indicates that the transfer was not a materially adverse change in her employment. For instance, Spees received the same salary while working in the tool room and did not lose any of her benefits. And, as JMI points out in its brief, the working conditions in the tool room were in some ways better than those while welding. JMI contends, for example, that the summer heat was more tolerable in the tool room because Spees could wear two fewer pieces of gear than when welding, and JMI provided a small fan for Spees's personal use. Spees was also not subject to the toxic fumes from welding while working in the tool room.

Nonetheless, the majority ultimately concludes that "Spees's transfer to the tool room resulted in her working in a more inconvenient shift in a position that was less challenging and that required fewer qualifications[,] . . . [such that] a reasonable jury could find that her transfer to the tool room constituted an adverse employment action."

I am not persuaded that any of those reasons (*i.e.*, inconvenience to Spees, a less challenging position and fewer required qualifications), individually or in the aggregate, could support a finding that Spees suffered an adverse employment action when she was transferred to the tool room. Most significantly, Spees was not subject to "salary or work hour changes[,]" she "enjoyed the same . . . rate of pay and benefits, and her duties were not materially modified." *Kocsis*, 97 F.3d at 885-86. Although the tool-room position did not require any specific training, as the welding position did, I do not believe that difference suffices to enable a reasonable jury to find Spees suffered an adverse employment action. This is particularly true because Spees was a "welder-trainee" and

that title does not carry any greater prestige than the tool room position Spees assumed upon her transfer.

The majority notes that Spees felt unchallenged in the tool room and found the tool room work "more boring" than welding. Likewise, the majority notes, "Spees did not describe in detail how the schedule change affected her, [but] she did state that she 'wasn't happy' about transferring to nights because she was a single mother." Spees's unhappiness with the change to the night shift and the fact that she felt unchallenged and "more bor[ed]" by the tasks she performed in the tool room, while not irrelevant to her, reflect a "mere inconvenience" and not a "significant change in employment status." *White*, 364 F.3d at 797-98. Rather, those feelings are more indicative of a "bruised ego" than a "significant change in employment status." *Id.* In addition, it is undisputed that Spees approached Pam DeWeese, an employee in JMI's Human Resource Department, about changing to the night-shift position (although this apparently was done after Tony Milam, her foreman, indicated that such a transfer would allow Spees to maintain her employment during the pregnancy).

Finally, I disagree with the majority's conclusion that the evidence does not "conclusively indicate that the tool-room position was a more pleasant working environment" as it pertained to heat and the physical demand on Spees. The evidence, in fact, did conclusively establish that the tool-room position offered a more pleasant working environment. As the majority recognizes, "welders are exposed to fumes, dust, and organic vapors in the course of their work[,]" and, in order to limit the inhalation of those substances, JMI provides welders with respirators to wear while on the job (though Spees often opted not to wear it while working as a welder because she "didn't feel like [she] needed one"). Such conditions are not present in the tool room, and there is no need for a respirator to work in the tool room. Welding work requires climbing up ladders and stairs, maneuvering into barge tanks and occasionally overhead handling of equipment, none of which was required to work in the tool room. Welders also wear a welding helmet and welding gloves, neither of which are necessary to work in the tool room. In addition, working in the tool room did not require Spees to work in a confined

space, as the welding position often necessitated, and, unlike the welding jobs, the tool room had a fan. All of these differences are significant, particularly when temperatures reached 100 degrees Fahrenheit or more on multiple occasions during the summer Spees worked for JMI.

For the foregoing reasons, I conclude that Spees did not suffer an adverse employment action when she was transferred to the tool room. Therefore, as a matter of law, Spees cannot prevail on her pregnancy-discrimination claim or her disability-discrimination claim with respect to her transfer to the tool room. Accordingly, I would affirm the judgment of the district court as it pertains to Spees's pregnancy-discrimination and disability-discrimination claims with regard to her transfer to the tool room.