**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0984n.06

**No. 11-3478**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

*Sep 06, 2012*

DEBORAH S. HUNT, Clerk

WILLIE J. COPELAND,                                    )
                                                       )
    Plaintiff-Appellant,                              )
                                                       )
v.                                                     )  ON APPEAL FROM THE UNITED
                                                       )  STATES DISTRICT COURT FOR THE
REGENT ELECTRIC, INC.; KEVIN                           )  NORTHERN DISTRICT OF OHIO
MCCARTHY,                                              )
                                                       )
    Defendants-Appellees.                             )

Before: GIBBONS, ROGERS, and COOK, Circuit Judges.

COOK, Circuit Judge.  Plaintiff Willie J. Copeland, an African-American, sued Regent Electric, Inc. ("Regent"), and its president, Kevin McCarthy, for a race-based layoff in violation of Title VII of the Civil Rights Act and Ohio Revised Code Chapter 4112.  After denying Copeland's request for additional discovery, the district court granted the defendants' motion for summary judgment.  For the reasons stated below, we AFFIRM the discovery order and the grant of summary judgment.

**I.  Background**

Because this appeal concerns the defendants' summary judgment motion, we summarize the record facts and draw all reasonable inferences in the light most favorable to Copeland, *see*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), without weighing the evidence or determining the truth of any disputed matter, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Regent, an electrical contractor, won a contract to provide electrical work for a school in the Toledo Public School District ("Westfield project"). Because Regent hires exclusively from union labor under a collective bargaining agreement ("CBA"), it turned to Local 8 of the International Brotherhood of Electrical Workers ("the union") to locate a journeyman inside wireman ("JIW") for the project. The union referred Copeland, an African-American JIW, in keeping with its CBA-mandated procedure of prioritizing the referral of members at the top of its Book 1 out-of-work list.[1] Regent accepted the referral, and Copeland began work at the end of July 2007.

About four months went by without incident. Then, Regent transferred five electricians from other projects to the Westfield project—three journeymen in one day, and one journeyman and one apprentice the next business day. The day after that, McCarthy, as Regent's president, laid off Copeland, purportedly due to a companywide decrease in workload. After the layoff, Regent

---

[1] The union divides its JIWs into four "book" groups corresponding to the members' years of experience, years working in the area, and certification. When distributing job opportunities, the union must refer the members in a lower-numbered group before referring those in a higher-numbered group. It may deviate from this established order only if the employer requires special skills or needs to maintain a certain age ratio in its workforce to meet contract obligations. Similarly, in layoffs, an employer must terminate temporary workers, followed by JIWs in the highest book group, before laying off JIWs in descending book-group order.

continued to transfer electrical workers to the Westfield project: fifteen JIWs and foremen[2] in all, and all with greater seniority in the company than Copeland.

Though adding staff to the Westfield project, where about 2,200 hours of JIW work remained, Regent was in the process of reducing its electrical staff on a companywide level. About a week before it laid off Copeland, it laid off ten other electrical employees, including two JIWs and five apprentices, also claiming reduction in work as the reason. In particular, the last JIW laid off during that round of reduction had about two weeks' less seniority than Copeland.

Copeland admitted that his prior experiences on the Westfield project and McCarthy's communication of the layoff news suggested no racial animus. He nevertheless felt that race contributed to his layoff because no other African-Americans worked for Regent to his knowledge, because Regent often fell short of the good-faith minority participation goals defined by Ohio and the Toledo School Board, and because Regent applied the reverse-seniority order strictly as to him, despite making exceptions for a few others. He also suspected disparate treatment because Regent rehired (for a different project) some of the Caucasian JIWs that it laid off from Westfield a month after Copeland, but extended no such opportunity to him.

After unsuccessfully pursuing remedies through his union's grievance procedure and seeking settlement with the help of the Equal Employment Opportunity Commission ("EEOC"), he received

---

[2]Because foremen do the same sort of work as JIWs, the parties count them as JIWs in their briefs. Accordingly, we will refer to both positions as JIWs.

a Notice of Right to Sue. Copeland then sued under Title VII and Ohio law, alleging that defendants discriminated against him by laying him off while retaining Caucasian JIWs with less experience on the project, retaining a Caucasian apprentice with less experience, and making exceptions to the reverse-seniority layoff order for a Caucasian JIW. Anticipating that defendants would attribute his layoff to a reduction in force and lack of work, he requested discovery of the following: 1) identification of all of Regent's projects under way or under contract as of January 1, 2007; 2) payroll or employment records for all field employees as of January 1, 2007, showing date of hire, job classification, race, JIW book group, date of termination, and reason for termination; and 3) an up-to-date Job History Detail Report for each Regent project identifying all hours worked on each project by each employee. Defendants objected to each request on the grounds that the information sought "is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence" and "is overly broad and unduly burdensome." After attempting to resolve the discovery dispute by telephone conference and by letters outlining the parties' arguments, the district court concluded that the defendants sufficiently complied with Copeland's requests by providing information specific to the Westfield project and to JIWs. Not long after, the district court granted the defendants' motion for summary judgment with respect to both claims.

On appeal, Copeland challenges the district court's denial of his discovery request, its analysis under the three-step *McDonnell Douglas* framework, and its failure to consider whether a plaintiff may prevail as long as race partially motivated the layoff.

## II. Analysis

We review de novo a district court's grant of summary judgment. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A district court may not grant summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets this burden, the nonmovant must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

Although this case involves a Title VII claim and an Ohio antidiscrimination claim, the same analysis generally applies to both.[3] *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Copeland may prevail in one of two ways: he may show that race was *the* motivation behind his layoff, under a single-motive theory of liability governed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), or he may show that race was *a* motivating factor in his layoff, under a mixed-motive theory governed by

---

[3]There is one notable difference, however: the Ohio claim permits individual liability, while the federal claim only permits employer liability. *Compare Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997) (noting lack of individual liability under Title VII), *with* Ohio Rev. Code § 4112.99 (permitting civil action for damages and injunctive relief against any violator of Chapter 4112). Whenever we discuss in this opinion the liability of the "defendants," collectively, we are referring to McCarthy's liability under the Ohio law and Regent's liability under the federal and Ohio laws.

No. 11-3478
*Copeland v. Regent Electric, Inc.*

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).  *See Cleveland Civil Serv. Comm'n v. Ohio Civil Rights Comm'n*, 565 N.E.2d 579, 584 (Ohio 1991) (citing *Miller Props. v. Ohio Civil Rights Comm'n*, 296 N.E.2d 300 (Ohio Ct. App. 1972)) (recognizing viability of mixed-motive theory under Ohio law).  But first, we address the parties' discovery dispute in order to determine whether Copeland deserves an opportunity to supplement the summary judgment record.

**A.      The district court acted within its discretion in denying Copeland's discovery request.**

Copeland challenges the district court's order denying discovery of information specific to each of Regent's projects and employees.  Defendants respond that Copeland failed to preserve the issue for appeal and that the district court correctly deemed the discovery request irrelevant and overbroad.

**1.      Copeland preserved the discovery issue for appeal.**

Defendants argue that Copeland failed to file a motion to compel or legal memoranda in compliance with Northern District of Ohio Local Rule 37.1(a), depriving the district court of the opportunity to rule on the discovery request after a full briefing.  Rule 37.1(a) requires parties to follow a three-step process before pursuing a motion to compel and submitting full memoranda. First, the party seeking the discovery must certify to the court that it made sincere, good faith efforts to resolve the dispute.  Second, the court may attempt to resolve the dispute by telephone conference. Third, the parties must outline their positions by letter, and the court must attempt to resolve the

6

issue without additional briefing.  Finally, "[i]f the [court] still is unable to resolve the dispute, the parties may file their respective memoranda in support of and in opposition to the requested discovery by a date set by the [court, which] may schedule a hearing on the motion to compel." Rule 37.1(a)(4).

District courts may deny discovery requests that fail to comply with this local rule. *See Lott v. Coyle*, 261 F.3d 594, 604 (6th Cir. 2001) (concluding that district court permissibly denied motion to compel where parties failed to confer by telephone conference); *Mohney v. USA Hockey, Inc.*, 5 F. App'x 450, 460 (6th Cir. 2001) (determining that district court did not abuse its discretion in denying discovery request because party failed to meet the first three steps of Rule 37.1 before filing a motion to compel).  Defendants contend that Copeland's failure to follow Rule 37.1(a)(4) forecloses appellate review of the district court's discovery order.  But Rule 37.1(a)(4) applies only "[i]f the [court] still is unable to resolve the dispute" after reviewing letters outlining the parties' positions.  In this case, by contrast, the district court was able to resolve the dispute.  Rule 37.1(a)(4) does not require Copeland to file a motion to compel or a memorandum on a request on which the district court already ruled.  We therefore may review this discovery dispute on appeal.

## 2. The district court acted within its discretion in denying Copeland's request.

"This court reviews a district court's decisions regarding discovery matters for an abuse of discretion." *Himes v. United States*, 645 F.3d 771, 782 (6th Cir. 2011) (citing *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009)).  "Abuse of discretion is defined as a definite and firm conviction that

the trial court committed a clear error of judgment." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989) (citing *Balani v. INS*, 669 F.2d 1157 (6th Cir. 1982)).

Federal Rule of Civil Procedure 26(b)(1) permits a party to obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense. Copeland asked Regent to identify all of its projects; provide the date of hire, job classification, race, JIW book group, date of termination, and reason for termination for all field employees since January 1, 2007; and furnish an up-to-date Job History Detail Report identifying all hours worked on each project by each employee. Regent responded with a limited production of documents. Instead of identifying all projects and all hours logged on each project by each employee, it disclosed a printout of companywide hour aggregates for each month, from August 2007 (the first complete month after Copeland's hire) until March 2008 (three months after Copeland's layoff), and a Union Deductions/Fringes Report containing a list of all electrical employees and their hours. Instead of producing data about date of hire and job classification for *every* employee, it provided employee-specific data only for the Westfield project and for JIWs, including an Employee Job Detail Report containing the pay and hours logged for each employee on the Westfield project and a printout reporting the date of hire, termination, rehire, and transfer data of all JIWs. It also produced a list of all terminations companywide between the date of Copeland's hire and layoff. The district court accepted this response as sufficient, deeming the unfulfilled portions of Copeland's discovery requests irrelevant and overbroad.

The district court acted within its discretion in denying Copeland's request for further discovery. To show that Copeland's termination coincided with a companywide reduction in force, Regent offered aggregate data showing a dramatic reduction in companywide hours between the time of Copeland's hire and termination. Regent also disclosed the departure of seventeen electrical workers between Copeland's hire and termination, seven of whom quit voluntarily. But voluntary or not, the departures that occurred between Copeland's hire and layoff show a reduction in force; Regent did not replenish its workforce with other new hires. A list naming Regent's pending projects and a Job History Detail Report of each employee's hours per project would add no new relevant information, because a project-specific or employee-specific increase in work cannot rebut Regent's aggregate data demonstrating a companywide downturn in electrical work and decrease in workforce. And though Copeland contends that actual business records documenting all employees' hours per project would provide more trustworthy evidence than "self-serving documents, created just for this litigation" showing aggregate data, he cites no authority suggesting that the district court clearly erred in accepting the defendants' disclosure as sufficient, in light of the uncontested evidence showing a workforce decrease of seventeen employees. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citations and internal quotation marks omitted)).

Furthermore, the district court acted within its discretion in limiting the discovery to JIWs, foremen, and Westfield employees, rather than to all field employees. Because Regent claims to select employees for layoffs using companywide seniority, rather than project-specific seniority, Copeland insists that information about employees on the other projects bears on the question whether Regent actually adheres to its professed seniority order. *See Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 907 (6th Cir. 1991) (defining the scope of discovery to match how locally the employer makes its decision). But even if Copeland were to find all that he hoped—evidence of significant deviation from reverse-seniority order in layoffs from other projects—he could not establish race discrimination. He cannot derive evidence of discrimination against African-Americans by pointing to evidence of layoffs of Caucasians. Such evidence would only strengthen the inference that Regent's layoff policies, however inconsistent, affected its workforce in a race-neutral way. *See Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 427 (6th Cir. 2009) (concluding that district court did not abuse its discretion in denying additional discovery on the grounds that the desired discovery would not "raise a genuine issue of material fact, even when taken in a light most favorable to Plaintiffs" (internal quotation marks omitted)). And it could not rebut the evidence that, within Copeland's own project, the two or three deviations from reverse-seniority order negatively affected Caucasians only. We therefore affirm the district court's discovery order.

**B.      A reasonable jury could not find that Copeland prevails under a single-motive theory.**

The usual Title VII burden-shifting framework applies to claims where a plaintiff alleges that the employer acted adverse to him solely because of race. *See McDonnell Douglas Corp.*, 411 U.S. at 802–04; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). A prima facie case requires the plaintiff to show that "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted). In order to prove the fourth prong in cases involving a workforce reduction, however, a plaintiff must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (citations omitted). The parties agree that Copeland meets the first three prongs, but disagree whether he must show "additional direct, circumstantial, or statistical evidence" under *Barnes* in order to meet the fourth prong.

**1. *Barnes* applies**.

Copeland argues that the district court erroneously applied *Barnes*'s "additional evidence" requirement because Regent replaced him, rather than eliminating his position in a reduction in force. In support, he relies on *Barnes*'s observation that "[a] person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties," but eliminated as a result of

reduction in force "when another employee is assigned to perform the plaintiff's duties in addition to other duties." *Id*. at 1465. Because Regent transferred five white employees from other projects to the Westfield project just days before Copeland's layoff, he infers that one or more of those transferees took over his duties after relinquishing their prior duties on other projects. He further claims that he need not identify specifically which of the transferees took over his work, as long as the jury could reasonably infer that one of them did.

But even assuming an employee took on the work previously assigned to Copeland, Copeland's layoff falls under *Barnes*'s definition of "reduction in force," because that term encompasses circumstances "when the work is redistributed among other existing employees already performing related work." *Id*. Regent, facing a companywide decrease in work, reduced its workforce and diverted some of its senior employees and a lower-wage apprentice to one of its work-heavy projects, laying off a junior employee instead. Prior to transfer, each of these five transferees performed the same sort of electrical work as Copeland on other Regent projects—four of them even held the same job title as Copeland. Given this record, a jury could only conclude that Regent redistributed the electrical work available companywide among employees performing "related work." Because the legal definition of "reduction in force" foreclosed the district court from inferring that a mere replacement occurred, the court correctly required "additional evidence" of discrimination.

Alternatively, Copeland argues that the district court should have ignored the "reduction in force" argument at the prima facie stage, because "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc). Routinely, however, courts apply the reduction-in-force analysis at the prima facie stage where the plaintiff fails to demonstrate a genuine factual dispute regarding the existence of the reduction in force. *See, e.g.*, *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 265 (6th Cir. 2010) (considering the employer's reduction in force during prima facie analysis, notwithstanding *Wexler*, where parties agreed on the existence of the reduction); *Geiger v. Tower Auto.*, 579 F.3d 614, 620, 623 & n.4 (6th Cir. 2009) (applying reduction-in-force analysis at prima facie stage where plaintiff failed to refute "overwhelming" record evidence of reduction in force). Though Copeland contends that he "*hotly* dispute[s]" the "legitima[cy]" of Regent's reduction in force, he presents no evidence to dispute the *existence* of the reduction. Neither the available evidence nor the evidence Copeland requested in discovery could rebut Regent's evidence of a companywide reduction in work hours (by about one-third) and workforce (by seventeen employees, whether by voluntary quits or layoff). *See Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir. 1993) (explaining that no genuine issue of material fact exists if a party fails to adduce concrete evidence to support its allegations).

Ultimately, whether one characterizes Regent's restructuring as a replacement or an elimination of a position, the fact that an employer facing a work shortage shifts the available work to some employees and lays off the rest (including an African-American)—without more—fails to

13

establish a prima facie case of discrimination. *See Schoonmaker*, 595 F.3d at 265 (explaining that, when workforce reduction is an issue, meeting the usual elements of the *McDonnell Douglas* test fails to rebut the most common legitimate reasons for discharge, and the plaintiff needs to show more to "make out a prima facie case"). The district court therefore correctly required that Copeland produce additional evidence under *Barnes* to establish his prima facie case.

### 2. Copeland produced insufficient additional evidence to meet *Barnes*.

In a reduction-of-force case, a plaintiff demonstrates a prima facie case by presenting "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (citing *Barnes*, 896 F.2d at 1465). Copeland offers three arguments.

First, Copeland argues that Regent treated the fifteen JIWs who began working on the Westfield project after him more favorably. In support, he notes that sometime after his layoff Regent transferred eleven of the fifteen to other projects and laid off three of the remaining four with the option of recalling them by name. As Copeland admits, however, one of those Westfield JIWs, a Caucasian laid off around the same time as Copeland, faced a permanent layoff without any recall option—just like Copeland. So too Regent declined to hire another JIW (though not affiliated with the Westfield project) laid off around the same time as Copeland. This evidence would not support a reasonable conclusion that Regent "singled out" Copeland because of race. And because Copeland

14

is the sole African-American in the small sample size, he could make no statistical showing of "an employer's pattern of conduct" with regard to race. *See Barnes*, 896 F.2d at 1466 (cautioning that statistics must show significant disparity and commenting on what standard deviations and statistical analyses other courts and panels found sufficient); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (questioning statistically suspect sample size). Furthermore, the transfers and temporary layoffs began about a month after the wave of layoffs in December 2007 involving Copeland. A reasonable jury, on these facts alone, could not infer by a preponderance of the evidence that Regent extended different opportunities to Copeland than to the employees still working a month later *because of race*. Copeland fails to establish a prima facie case of discrimination on account of this difference.

Second, Copeland argues that he may "establish a prima facie case by showing that he . . . possessed qualifications superior to those of [someone outside of a protected class] working in the same position." *Barnes*, 896 F.2d at 1466. Specifically, he claims that two qualities made him more desirable than the employees Regent retained on the Westfield project: 1) the length of his time at the Westfield project, and 2) his minority status, which would have helped Regent achieve the good-faith affirmative-action goals set by Ohio and the Toledo School Board. But a "subjective determination that he was better qualified" cannot establish a prima facie case for discrimination. *See LaGrant v. Gulf & W. Mfg. Co.*, 748 F.2d 1087, 1091 (6th Cir. 1984); *see also Schoonmaker*, 595 F.3d at 266 (requiring objective evidence—e.g., competence "as measured by objective, company-established criteria"—to demonstrate a prima facie case). Copeland presents no evidence

15

to suggest that these self-selected qualifications mattered to Regent or that such criteria objectively should have governed its layoff decisions. Contrary to Copeland's assertion, an employer may select employees for layoffs by seniority, even absent a collective bargaining agreement or an official company policy mandating its consideration. "So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates." *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (citing *Burdine*, 450 U.S. at 259); *Canham v. Oberlin Coll.*, 666 F.2d 1057, 1061 (6th Cir. 1981) ("The employer has . . . discretion to choose among candidates with different but equally desirable qualifications.").

Last, Copeland contends that, even accepting the company-established criterion of seniority, he could establish a prima facie case of discrimination by showing that Regent applied this criterion differently to Caucasian employees. Namely, Copeland faults the defendants for deviating from strict seniority order by 1) retaining one Caucasian JIW with less seniority than certain other Caucasian JIWs whom Regent laid off and 2) laying off one Caucasian JIW with more seniority than certain other Caucasian JIWs, whom Regent retained. (He admits, however, that all of the JIWs retained on the Westfield project had greater seniority than he did.) Copeland implies that, by failing to make the same exceptions for him, Regent favored Caucasians over African-Americans. But a reasonable jury could not infer from this alone that defendants singled out Copeland for racial reasons, as Regent also declined to make these exceptions for most of the Caucasian JIWs. To the extent that Copeland argues that the defendants failed to adhere to a seniority order at all, even this cannot establish a prima facie case, because he fails to explain how this arbitrariness—impacting

16

Caucasian and African-American alike—singled him out on account of race. Copeland thus fails to rebut the most likely race-neutral reason for his layoff—the companywide reduction in force. Without a prima facie case, Copeland's single-motive claim cannot proceed to trial.

### 3. Copeland also failed to show pretext.

Even assuming for argument's sake that Copeland made out a prima facie case, *McDonnell Douglas's* third prong requires him to demonstrate that any legitimate non-discriminatory reason proffered by Regent is a pretext for the its true discriminatory motive. 411 U.S. at 804. The evidence that Copeland introduced at summary judgment is insufficient to create a genuine issue of fact for trial.

Copeland interprets *White* too broadly, alleging that he may prove pretext simply by persuading the jury of the "unreasonableness" of the defendants' decision. *White* cautions courts to consider unreasonableness in the pretext context only "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.*; *see also Burdine*, 450 U.S. at 259 ("The fact that a court may think that the employer misjudged the qualifications of applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." (citations omitted)). The case law thus establishes that not all debatable judgment calls by the employer raise a question of fact regarding pretext. Because the inquiry ultimately remains anchored to pretext, rather than unreasonableness, Copeland must show more than mere unreasonableness; he must show

17

unreasonableness to such a degree that a reasonable jury could infer that Regent lied about its motives. *See White*, 533 F.3d at 393 (quoting approvingly cases acknowledging that the extent to which unreasonableness may suggest pretext differs depending on how "idiosyncratic or questionable the employer's reason" or how "significantly better qualified" the plaintiff may seem to the jury).

Copeland claims that the defendants laid him off unreasonably because his retention would have helped Regent correct its shortfall in meeting its good-faith minority participation goals. But mere second-guessing of the qualities Regent should have preferred cannot establish an unreasonableness that rises to the level of suggesting pretext. *See Wrenn*, 808 F.2d at 502 (citation omitted); *Canham*, 666 F.2d at 1061; *cf. Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978) ("Courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it."). No reasonable jury could deem the defendants' decision to favor company-level seniority so unreasonable as to conclude from this that Copeland proved pretext. An employer's decision to value an employee's history with the company, even when no collective bargaining agreement or written policy compels it to do so, is not particularly idiosyncratic or questionable. Even factoring in the state's race-based hiring goals, a reasonable jury could not find that these considerations would have so outweighed a reasonable employer's race-neutral criteria as to deem Regent's termination of Copeland a product of racial animus. *See Furnco*, 438 U.S. at 577–78 (explaining that, while Title VII prohibits discrimination, it does not impose a duty to adopt practices that maximize the number of minority employees).

**C.      A reasonable jury could not find for Copeland under a mixed-motive theory.**

Alternatively, Copeland contends that he may prevail under a "mixed-motive" theory. *See* 42 U.S.C. § 2000e-2(m) ("Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). Defendants urge us to disregard the mixed-motive theory because Copeland failed to plead it.

**1.      Copeland sufficiently pleaded his "mixed-motive" theory.**

Copeland's mixed-motive argument appeared for the first time in his opposition to defendants' motion for summary judgment. In reply, the defendants protested that the complaint failed to notify them adequately of Copeland's intent to bring a mixed-motive claim, citing *Hashem-Younes v. Danou Enters.*, 311 F. App'x 777, 779 (6th Cir. 2009). The district court then granted summary judgment for defendants, expressing no opinion on Copeland's mixed-motive claim. Both parties maintain their positions on appeal.

"[W]here language in a complaint is ambiguous," the Sixth Circuit employs a "'course of the proceedings test' to determine whether defendants have received notice of the plaintiff's claims," *Carter v. Ford Motor Co.*, 561 F.3d 562, 566 (6th Cir. 2009), analyzing the adequacy of notice on a "case-by-case basis," *id.* at 568. *Accord Moore v. City of Harriman*, 272 F.3d 769, 772, 774 (6th

Cir. 2001) (en banc) (plurality opinion) ("Subsequent filings in a case may rectify deficiencies in the initial pleadings." (citations omitted)).  A plaintiff may sufficiently notify a defendant of an argument by raising it in a response to summary judgment, *see id.* at 774 (citing *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 491 (6th Cir. 1995)); *Vencor, Inc. v. Standard Life & Accident Ins. Co.*, 317 F.3d 629, 641 n.11 (6th Cir. 2003), provided that the party does not disavow its intent to use the argument earlier in the proceedings, *see Carter*, 561 F.3d at 568.

We conclude, in accord with *Moore* and *Vencor*, that Copeland's response to the motion for summary judgment adequately notified defendants of his new argument.  At no point did Copeland disclaim his intent to pursue a mixed-motive theory.  The complaint, though ambiguous, leaves the possibility open. *See* Compl. ¶¶ 3, 31, ECF No. 1 (pleading generally that defendants terminated his employment on "a racial discriminatory basis," without specifying whether Copeland intends to proceed on a single-motive or mixed-motive theory, and referencing mixed-motive amendment by stating that the action "is brought pursuant to Title VII of the Civil Rights Act of 1964, *as amended*" (emphasis added)).  Furthermore, Copeland's response to the motion for summary judgment expressly discusses mixed motives.  *See Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) (holding, in a case where party did not disavow intent to use mixed-motive theory, that plaintiff adequately notified defendant of Title VII mixed-motive claim where footnote in plaintiff's motion for summary judgment identified claim as a mixed-motive claim).  And defendants incorrectly rely on *Hashem-Younes*: the plaintiff in that case raised a mixed-motive claim for the first time on appeal.  311 F. App'x at 779.  We proceed to the merits, then.

20

**2.      No genuine issue of material fact exists regarding mixed motive.**

To prevail on a mixed-motive claim, Copeland must produce "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race . . . was a motivating factor for'" Copeland's termination.  *Desert Palace*, 539 U.S. at 101 (quoting 42 U.S.C. § 2000e-2(m)); *accord White*, 533 F.3d at 400.  Though usually fact-intensive and best left for the jury, *see White*, 533 F.3d at 402, a mixed-motive claim fails where "the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim," *Spees*, 617 F.3d at 390 (citing *White*, 533 F.3d at 400).

Apparently relying on the same evidence with which he supported his single-motive claim, Copeland asserts that race at least partially motivated Regent to terminate him.  But notwithstanding the lower threshold of evidence necessary to support a mixed-motive claim, Copeland's arguments fail under the mixed-motive analysis as well.  First, he attempts to show that Regent's asserted reliance on its reverse-seniority layoff system is pretextual, noting that a plaintiff may "demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'"  *White*, 533 F.3d at 393 (footnote omitted) (quoting *Wexler*, 317 F.3d at 578).

Alternatively, Copeland argues that Regent maintained separate layoff procedures for African-Americans and Caucasians.  In support, he again refers to the fact that Regent occasionally

21

deviated from strict seniority order when laying off other employees, even though he had the lowest seniority of the JIWs in Regent's employ at the time of his termination. Regent deviated from strict reverse-seniority order—Copeland, Heise, Wallace, Lockhart, Lemon, Snavely, Yetter—by making two or three exceptions to the order (i.e., Copeland, Wallace, Heise, Lemon, Snavely, Slomowicz, Yetter). In the first wave of companywide layoffs in December 2007, Regent laid off the three JIWs of lowest seniority; it switched the order of Wallace and Heise by only three days' difference (Regent laid off Wallace on December 14 and Heise on December 17). In the second wave of layoffs on January 4, 2008, Regent exempted Lockhart, whom the leadership allegedly intended to groom for a foreman position, and then laid off the next two according to seniority order—Lemon and Snavely. It also deviated from seniority order by laying off Slomowicz early, ahead of five employees of lesser seniority. Then, over a year and a half later, it returned to the normal reverse-seniority order by laying off the next person in line: Yetter. Contrary to Copeland's assertions, this evidence shows three deviations at best, if one counts the three-day deviation in the layoffs of Wallace and Heise. Because defendants describe their reverse-seniority policy as a general practice, rather than a mandated policy, the existence of two deviations—one retained despite lower seniority, and another laid off early despite greater seniority—fails to establish a more favorable layoff order for Caucasians.

But more importantly, any irregularities in the layoff order adversely affected Caucasians and Copeland alike, foreclosing a reasonable inference of racial motive. A reasonable jury could not infer racial bias from Regent's decision to exempt Lockhart from the layoffs, because Regent refused

22

to exempt the six others at the bottom of the reverse-seniority list, whether Caucasian or African-American. *Cf. Kimble v. Wasylyshyn*, 439 F. App'x 492, 500 (6th Cir. 2011) (acknowledging that the employer's failure to follow professed criteria could permit the inference of race discrimination under the circumstances of that case, because there the sole minority candidate received less favorable treatment than the sole Caucasian candidate). Similarly, Regent's decision to lay off Slomowicz early gives no support to Copeland's racial-motive theory, because the sole victim of that deviation from reverse-seniority order was Caucasian. By contrast, Copeland was laid off as the least senior employee at the time of his termination, rather than because of an out-of-order layoff, just like the remaining laid-off JIWs (who happen to be Caucasian).

Copeland further complains that the defendants' "reduction in force" excuse fails to explain why they declined to place him on temporary layoff subject to recall by name, as they did for some of their other employees. Copeland cannot rely on the recalls to show a race-based motive, however, when all others laid off within a few days of his termination received the same treatment, consistent with the defendants' explanation that they only extended rehiring opportunities to those laid off closer to the time they were looking to rehire. Though Regent recalled three of the four employees it laid off toward the end of the Westfield project, it uniformly denied this courtesy to all JIWs it laid off around the time of Copeland's termination, whether Caucasian or African-American. Furthermore, Copeland also acknowledged that no one at work treated him negatively on account of his race prior to his layoff. In the absence of evidence that could persuade a reasonable jury by

a preponderance of the evidence that race played a role in Copeland's layoff, the district court

properly granted summary judgment to defendants on the mixed-motive claim.

## III. Conclusion

As Copeland fails to link his grievances to race, we AFFIRM.