NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0630n.06

No. 14-3922

FILED
Sep 09, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

OMAR ALOMARI,                            )
                                         )
        Plaintiff-Appellant,             )
                                         )
                                         )    ON APPEAL FROM THE
v.                                       )    UNITED STATES DISTRICT
                                         )    COURT FOR THE
OHIO DEPARTMENT OF PUBLIC SAFETY,        )    SOUTHERN DISTRICT OF
                                         )    OHIO
        Defendant-Appellee.              )
                                         )
                                         )

BEFORE:     SUHRHEINRICH, BATCHELDER, and CLAY, Circuit Judges.

        SUHRHEINRICH, Circuit Judge.

        Omar Alomari ("Plaintiff") filed suit against the Ohio Department of Public Safety

("ODPS"), ODPS Director Thomas Charles, former ODPS Director Thomas Stickrath, and

former Ohio Homeland Security ("OHS") Director William Vedra (collectively, "Defendants"),

alleging, *inter alia*, that Defendants discriminated against him on the basis of national origin,

religion, and race.  Plaintiff further alleged retaliation against his exercise of protected First

Amendment speech.  The district court granted summary judgment for Defendants.  For the

following reasons, we **AFFIRM**.

        In November 2005, OHS, a division within ODPS, hired Plaintiff as a contract employee.

He became a permanent, full-time Multicultural Liaison Officer one year later.  Plaintiff reported

to John Overly, Executive Director of OHS, and then to William Vedra, Overly's successor.

Plaintiff's duties included (1) building productive relationships between OHS, law enforcement, and Arab and Muslim communities; (2) researching and authoring publications on Arab and Muslim communities; and (3) presenting his research to law enforcement at training sessions.

During these training sessions, Plaintiff's views often conflicted with the views of law enforcement officials. For example, at a November 2008 training session for Ohio law enforcement officials, Plaintiff made a presentation in which he explained that Muslims generally fell into four categories: Fundamentalists, Islamists, Jihadists, and Secular Moderate Muslims. After Plaintiff's remarks, Todd Sheets, an Officer with the Columbus Police Department ("CPD"), gave a presentation on international terrorism. Officer Sheets commented on Plaintiff's statements. He said, "I'm not sure about Fundamentalist, Islamist or Jihadist. When I stop a Muslim, I don't ask if they're a Fundamentalist, Islamist or Jihadist. To me, they're all the same." Officer Sheets claimed that Arab Muslims in Central Ohio had links to terrorism, and that Islam commanded violence. Afterwards, Plaintiff complained to Director Vedra about Officer Sheets's comments, alleging that they implied all Arabs and Muslims were terrorist suspects, which contradicted Plaintiff's presentation. Plaintiff believed that the inconsistent messages could confuse law enforcement.

In January 2009, Plaintiff attended a two-day training session at the Columbus Police Academy. At this session, a presenter claimed that Christianity and Islam have been in conflict for more than 1,400 years, and Muslims will use violence to conquer and convert the entire world to Islam. Plaintiff told the presenter that he was irresponsible for "giving his opinions, not facts" to the law enforcement community. During and immediately after the training session, Plaintiff complained to numerous officials, including CPD Deputy Director John Rockwell; Chief Deputy Steve Martin of the Ohio Sheriff's Department; OHS Regional Coordination Unit

Supervisor Andrew Stefanik; OHS Fusion Center Counterterrorism Research Analyst Ben Presson; and OHS Senior Strategic Planning Officer Tracy Proud. Plaintiff also emailed George Selim, a Policy Advisor at the U.S. Department of Homeland Security's ("DHS") Office of Civil Rights and Civil Liberties, to voice his concern that public DHS funds supported biased training sessions. Finally, because Director Vedra did not attend the session, Plaintiff drafted a report summarizing the event and sent it to him. The report stated that the first day of training was full of inaccuracies about the history and tenets of Islam, as well as Arab culture.

Between April 13 and 15, 2010, the CPD held a two-and-a-half day training session entitled "Understanding the Threat to America." Although Plaintiff did not attend the event, someone in attendance called Plaintiff and told him that the presenter made disparaging remarks about him. Specifically, the presenters showed the audience a picture taken of Plaintiff and Director Vedra with a representative from the Council on American-Islamic Relations ("CAIR"). The presenter deemed CAIR to be a "terrorist organization" and thus alleged that Plaintiff and Director Vedra "met with terrorists."[1] On the evening of April 13, 2010, Plaintiff notified Director Vedra that these presenters made "personal" attacks and tried to "destroy" him. Director Vedra subsequently contacted and met with CPD Deputy Director Rockwell, and the two agreed that CPD would allow OHS and Plaintiff to "vet" any future speakers.

Plaintiff also presented his argument concerning Islamic radicalism to the United States House Committee on Homeland Security on March 17, 2010. As part of his presentation, Plaintiff produced a brochure titled "Agents of Radicalization" and a report titled "A Guide to Arab and Islamic Culture."

---

[1] Because some CAIR officials were under FBI investigation, the FBI ordered its agents not to personally meet with representatives from CAIR, but it allowed them to keep open lines of communication with the organization. OHS adopted the same position.

On March 18, 2010, soon after Plaintiff's testimony before Congress, *The Jawa Report*, an anonymously-authored internet blog, published an article titled "Muslim Leader: Ohio Homeland Security publishing 'classic Islamist propaganda.'" On April 16, 2010, *The Jawa Report* published an article asserting that OHS destroyed thousands of Plaintiff's "Agents of Radicalization" brochures because the brochures promoted groups that the FBI linked to terrorism. And on April 19, 2010, *The Jawa Report* posted an article criticizing Plaintiff and Director Vedra for their interaction with CAIR. The article quoted an anonymous source who stated that at a meeting with law enforcement, Director Vedra "explained that we continue to work with CAIR just like we meet with gangbangers, drug dealers, mafia underlings, criminal informants and other 'bad guys' to gather information."

On April 20, 2010, *The Jawa Report* released an article that precipitated Plaintiff's discharge from OHS. The piece revealed that Plaintiff's previous employer, Columbus State Community College ("Columbus State"), hadfired Plaintiff for engaging in a sexual relationship with a female student. The next day, *The Jawa Report* again reported that Columbus State had fired Plaintiff for "violating their sexual harassment policy by sleeping with infidel coeds taking his classes." It also reported that another ODPS employee, Olen Martin, falsified his credentials. Martin was the Coordinator for the Northern Border Initiative, an operation that gathered national security intelligence on the waterways between Ohio and Canada. To support this contention, the article included an image of Martin's LinkedIn profile, which listed two degrees from Suffield University. *The Jawa Report* described that institution as an "illegal diploma

mill." On April 27, 2010, the blog issued another report concerning Plaintiff's lawsuit against the student with whom he conducted a sexual relationship.[2]

As a result of these articles, reporters contacted ODPS to inquire whether the department was aware of Plaintiff's previous employment history with Columbus State. Director Vedra approached Plaintiff and asked him if the allegations were true. Plaintiff admitted that he did not include Columbus State on his employment application and that he had a relationship with a student while teaching there. After that conversation, Director Vedra spoke with his supervisor, Cathy Collins-Taylor. The two decided that an administrative investigation would be appropriate in Plaintiff's situation, but that human resources could handle the allegations concerning Martin. Director Vedra reasoned that even if Martin essentially paid for his degrees from a "diploma mill," his misconduct was still less serious than that of Plaintiff because those degrees were not minimum requirements for Martin's position.

On May 7, 2010, ODPS assigned Kathleen Botos to conduct the administrative investigation into allegations that Plaintiff failed to include information about his job at Columbus State in his employment application. Botos reviewed Plaintiff's employment application and background investigation packet, and found no reference to employment at Columbus State in either document. Although the computerized credit check during the employment background investigation listed Columbus State as a previous employer, that

---

[2] Plaintiff worked as a professor at Columbus State from 1991 to 1996. In June 1996, Plaintiff began an intimate relationship with Sheri Lenk, a student at Columbus State. Lenk ended the relationship in September 1996, but then attempted to restart it numerous times. However, in December 1996, Lenk filed a sexual harassment claim against Plaintiff. After conducting an investigation, Columbus State removed Plaintiff as an employee that same month. Plaintiff filed a grievance after his discharge. After two years of litigation, the parties ultimately reached a settlement agreement. On January 19, 1999, Plaintiff sued Lenk in the Franklin County Court of Common Pleas, alleging (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; (3) tortious interference with a contract; and (4) negligence. Lenk moved for summary judgment on March 31, 2000, which the court granted on August 9, 2000.

information was not listed elsewhere in the background investigation packet. Botos then interviewed Plaintiff on May 12, 2010. Plaintiff conceded that he did not include "many" of his previous employers on the ODPS employment application, including Columbus State. Plaintiff stated that he resigned from Columbus State as part of an arbitration settlement agreement. But when Botos confronted Plaintiff with documentation showing Plaintiff filed a wrongful termination claim against Columbus State with the Ohio Civil Rights Commission, Plaintiff instead claimed that Columbus State threatened to terminate his employment. Botos then inquired why Plaintiff was under investigation while at Columbus State. Plaintiff averred that he had a "relationship" with a Columbus State student, but asserted that she was not *his* student. However, Plaintiff subsequently contradicted himself, stating that the student enrolled in one of his classes, which prompted him to end the relationship.

After the interview, Botos worked with ODPS in-house counsel to obtain records from Columbus State via public records requests. Based on these records and her interview with Plaintiff, Botos drafted a report on June 3, 2010. The report reached four conclusions. First, Plaintiff purposely omitted several past employers from his employment application, including Columbus State. Second, evidence indicated that Columbus State terminated Plaintiff's employment after discovering his relationship with a student,[3] which contradicted Plaintiff's

---

[3] At oral argument, the parties disputed whether Columbus State actually fired Plaintiff. Overwhelming evidence in the record indicates that Columbus State terminated Plaintiff's employment. On December 16, 1996, Doug Montanaro, the Chair of Columbus State's Humanities Department, sent a memorandum to Erv Zitlow, the Director of Human Resources. Montanaro described a meeting during which the panel charged with investigating Plaintiff's misconduct found him guilty of professional misconduct and harassment related to his relationship with Lenk. The panel informed Plaintiff that he would be separated if he did not choose to resign. Plaintiff "said that he would not resign and that he wished to grieve the separation decision." Later, when faculty members wrote letters to the President of Columbus State alleging that Plaintiff's disciplinary process lacked sufficient safeguards, they referred to

claim that he resigned from Columbus State. Third, although Plaintiff declared that he omitted his work at Columbus State because it was irrelevant to the position he sought, in reality Plaintiff performed relevant duties such as teaching an Arabic class and coordinating courses on Islam and the Middle East at Columbus State. Finally, Plaintiff disregarded the instructions on his employment application, which required disclosing all previous employers. Given the circumstances of Plaintiff's departure from Columbus State, his failure to disclose that employment history created the appearance of impropriety.

After conducting a pre-disciplinary hearing for Plaintiff, ODPS Director Stickrath held a meeting on June 29, 2010, to discuss the results of Botos's administrative investigation and to make a decision concerning Plaintiff's discipline. Various ODPS officials, including Director Vedra, attended the meeting. In-house counsel Heather Reed-Frient also attended the meeting. Director Stickrath received input from the individuals at the meeting, and he ultimately decided to terminate Plaintiff. He reasoned that ODPS would probably not have hired Plaintiff if he had disclosed his full employment history in his application. On June 30, 2010, ODPS terminated Plaintiff's employment.

On July 13, 2011, Plaintiff filed a complaint, alleging six claims: (1) national origin discrimination, in violation of Title VII; (2) religious discrimination, in violation of Title VII; (3) racial discrimination, in violation of 42 U.S.C. § 1981; (4) retaliation for opposing discrimination, in violation of 42 U.S.C. § 1981; (5) denial of equal protection, in violation of 42 U.S.C. § 1983; and (6) First Amendment retaliation, in violation 42 U.S.C. § 1983. The parties filed cross motions for summary judgment. The district court granted Defendants' motion for summary judgment and denied Plaintiff's motion for summary judgment. First, the

Plaintiff's "firing" and "discharge." Finally, the Vice President for Academic Affairs explicitly upheld Plaintiff's "discharge."

district court dismissed Plaintiff's national origin, religion, and race discrimination claims under Title VII and 42 U.S.C. § 1983, holding that no reasonable juror could objectively conclude that Plaintiff's race, religion, or national origin improperly motivated the decision to terminate him. Second, the court refused to address Plaintiff's hostile work environment claim, which Plaintiff raised for the first time on summary judgment, because Plaintiff did not properly plead such a claim. Third, the court dismissed Plaintiff's race discrimination and retaliation claims under 42 U.S.C. § 1981, concluding that individuals acting under color of state law committed the alleged § 1981 violations, and Plaintiff did not properly prosecute these claims under § 1983, the sole remedy available for such misconduct. Finally, the court rejected Plaintiff's constitutional retaliation argument, reasoning that the First Amendment did not protect Plaintiff's speech because it related to his job duties as a Multicultural Liaison Officer, and no causal connection existed between Plaintiff's speech and his termination. This appeal followed.

## II.

We review a district court's grant of summary judgment *de novo*. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To the extent Plaintiff also raises issues on appeal concerning limits on discovery and discovery sanctions, however, we review those claims for an abuse of discretion. *Bentkowski v. Scene Magazine*, 637 F.3d 689, 696 (6th Cir. 2011).

### A. Discrimination Claims

Plaintiff argues that the district court improperly dismissed his national origin and religious discrimination claims brought under Title VII and 42 U.S.C. § 1983 because Plaintiff failed to provide direct or circumstantial evidence that discriminatory animus motivated the

decision to terminate him.[4]  "The elements for establishing an Equal Protection claim under § 1983 and the elements for establishing a violation of [a] Title VII disparate treatment claim are the same."  *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 917-18 (6th Cir. 2014).  A single analysis will therefore suffice to address Plaintiff's claims.

We analyze this claim under a mixed-motive analysis because Plaintiff gave sufficient notice of mixed-motive discrimination in his complaint and motion for summary judgment. "[A] Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was *a* motivating factor for the defendant's adverse employment action."  *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)).  Plaintiff can establish discrimination "either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (quoting *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997)), *overruled on other grounds by, Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 180 (2009).  Although Plaintiff addressed both direct and circumstantial evidence below, he cites only circumstantial evidence on appeal.

### 1. Remarks by Director Vedra

Plaintiff identifies several remarks by Director Vedra as circumstantial evidence of a discriminatory intent to fire him.  First, at a civil service hearing for Plaintiff's appeal before the State Personnel Board of Review ("SPBR"), Director Vedra stated that he replaced Plaintiff with a woman "to send a signal to the community that—that you're in America," and that he believed

---

[4] Plaintiff also cited racial discrimination in his complaint, but he addresses only national origin and religious discrimination on appeal.

Plaintiff overemphasized outreach to the Arab community. Second, Director Vedra allegedly told a group of law enforcement officials that "we continue to work with CAIR just like we meet with gangbangers, drug dealers, mafia underlings, criminal informants, and other 'bad guys' to gather information."

Plaintiff claims that the district court erred because it did not evaluate whether these remarks constituted circumstantial evidence of discriminatory intent. Plaintiff waived this argument, however, because he claimed in his motion for summary judgment that Director Vedra's remarks comprised only *direct* evidence of discrimination. "[I]ssues not presented to the district court but raised for the first time on appeal are not properly before this court." *J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir. 1991). Plaintiff does not dispute the district court's determination that these remarks did not amount to direct evidence of discrimination because they required jurors to draw inferences that discriminatory animus motivated Director Vedra's remarks. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). Accordingly, Plaintiff's argument fails.

### 2. Disparate Treatment

Plaintiff further claims that Director Vedra's decision to investigate Plaintiff for omitting his full job history from his employment application, but not to investigate Martin for including a "diploma mill" on his employment application, was an example of disparate treatment prompted by discriminatory intent.

In order to establish the existence of a discriminatory motive based on disparate treatment, a plaintiff must demonstrate that the comparable employees are nearly identical in all relevant aspects. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 729 (6th Cir. 2004). Plaintiff argues that he and Martin were similarly situated employees in two respects. First, Plaintiff contends

that their misconduct was similar. Although he omitted employment history from his application, Plaintiff reasons, Martin "provided false information regarding his educational achievement during the employment process by intentionally [mis]representing that he had legitimate degrees." We disagree. Plaintiff *omitted* his past employment history with Columbus State seemingly *to avoid discovery* of his sexual misconduct at that institution. In contrast, Martin *disclosed his actual credentials*, albeit from a "diploma mill." *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (holding that two employees were not similarly situated where "their alleged acts of misconduct are of a very different nature, and there are legitimate reasons why [a supervisor] would treat them differently").

Plaintiff further contends that Martin's misconduct was analogous to Plaintiff's misdeeds because Martin provided false information about when he obtained his degrees and the length of time he attended Suffield University. For example, Martin testified at his deposition that he obtained both of his degrees in 2005, but his employment application stated that he received one degree in 1996 and another in 1997. Similarly, Martin testified that he did not complete any coursework to obtain his degree, but his employment application stated that it took two years to complete one degree and three years to complete the other. However, the record does not indicate that Director Vedra knew of these false details at the time he decided to investigate Plaintiff and not Martin. All of the evidence concerning these falsehoods comes from Martin's deposition testimony, which occurred long after the decision to terminate Plaintiff.

Second, Plaintiff avers that he and Martin were similarly situated because their positions were both "unique." Martin was the Coordinator for the Northern Border Initiative, an "important project" that gathered national security intelligence on the waterways between Ohio and Canada. Similarly, as a Multicultural Liaison Officer, Plaintiff held a position that was "one

of a kind in the country." However, Plaintiff offers a superficial, generalized comparison. "[T]he plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citation omitted). While both positions may have been unique, the disparity in disparate treatment between Plaintiff and Martin can be explained by the *prominence* of Plaintiff's position. Plaintiff's job was public and national in scope: he attended law enforcement training sessions in order to present research on broad topics like Islamic culture and radicalization, and he testified before the U.S. House Committee on Homeland Security on one occasion. In contrast, Martin's role was local and less prominent—coordinating an operation that monitored the waterways between Ohio and Canada for national security threats.

Plaintiff lastly argues that the district court ignored the deposition testimony of OHS Deputy Director Earl Mack. In his deposition, Deputy Director Mack speculated that discriminatory animus motivated Director Vedra's decision to investigate Plaintiff over Martin. Deputy Director Mack explained that he did not understand why Plaintiff was the subject of an investigation while Martin, who "lie[d] about a degree that he had," was not investigated. When subsequently asked whether he felt Plaintiff's being the target of an investigation "had something to do with the fact that he was Arab America," Deputy Director Mack replied, "I sure did." However, Deputy Director Mack's testimony simultaneously reveals that the disparate treatment between Plaintiff and Martin was motivated by their different misconduct, not by animus. According to Deputy Director Mack, Director Vedra told him that just because "you don't like his degrees don't [sic] mean it's not a degree." As such, beyond pure speculation, Deputy Director Mack's assertions provide no evidence of a discriminatory motive behind the disparate

treatment of Plaintiff and Martin. Consequently, no reasonable juror could believe that discriminatory animus motivated Plaintiff's administrative investigation or termination.

## B. Hostile Work Environment Claim

Plaintiff argues that the district court erred in concluding that Plaintiff did not present a hostile work environment claim until the summary judgment phase. Plaintiff alleges that he pleaded sufficient facts in his complaint to put Defendants on notice of that claim.

Generally, a plaintiff cannot raise a claim for the first time at the summary judgment stage. *See Carter v. Ford Motor Co.*, 561 F.3d 562, 568 (6th Cir. 2009). At the same time, no "magic words" in the complaint are necessary to state a claim—courts must instead "examine the substance of a plaintiff's allegations." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 629 (6th Cir. 2013).

It is undisputed that Plaintiff did not explicitly allege a legal theory of hostile work environment in his complaint. At the same time, Plaintiff's complaint did make *some* references to harassment in its facts section. The complaint alleged that "presenters at the trainings had perpetrated a two-year campaign to harass and destroy Plaintiff's reputation and character based on the simple reason that he is an Arab Muslim," and that individuals involved with Ohio law enforcement counterterrorism training obtained and published public records in order to harass Plaintiff. But these facts were insufficient to raise a claim for hostile work environment because they did not indicate that this harassment by non-ODPS employees outside of the official workplace impacted Plaintiff's work performance or affected his work environment. *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 994 (6th Cir. 2009) (holding that a hostile work environment claim must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of

the victim's employment and create an abusive working environment" (citation omitted)); *Whitaker v. Carney*, 778 F.2d 216, 221 (5th Cir. 1985) (noting that employers are generally not liable for harassment by nonemployees outside the workplace). Accordingly, Plaintiff failed to properly plead a claim for hostile work environment.

## C. First Amendment Retaliation Claim

Plaintiff asserts that the district court erred in dismissing his First Amendment retaliation claim[5] because Plaintiff's speech—criticizing law enforcement training sessions and the DHS funding of those sessions—was part of his official duties, and Plaintiff failed to present concrete evidence showing that the decision to terminate him was motivated by his speech.

Plaintiff argues, in part, that his speech was constitutionally protected because he spoke "as a citizen." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007) (citation omitted). However, Plaintiff made his criticisms pursuant to his official duties as a cultural liaison. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The court looks at the "content and context" of the speech to determine whether it was made pursuant to official duties, including "the impetus for [the] speech, the setting of [the] speech, the speech's audience, and its general subject matter." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540 (6th Cir. 2012) (citation omitted).

The record reflects that one of Plaintiff's primary job duties was to educate law enforcement during training sessions, and as part of that function, to analyze the effectiveness of the information communicated. For instance, following a January 2009 training session attended

---

[5] Plaintiff also raised a retaliation claim in his complaint stemming from his opposition to discrimination under 42 U.S.C. § 1981, but he does not appeal that issue.

by Plaintiff but not by Director Vedra, Plaintiff drafted a report compiling the inaccuracies Plaintiff observed at the session. Similarly, after Plaintiff heavily criticized an April 2010 CPD training session because of a presenter's inflammatory remarks, ODPS let Plaintiff vet future speakers at CPD training sessions in order to eliminate bias.

And even if Plaintiff's duties did not officially include analyzing training sessions, "ad hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description." *Weisbarth*, 499 F.3d at 544. This is especially true if the speech "owes its existence to a public employee's professional responsibilities." *Garcetti*, 547 U.S. at 411. Plaintiff responded to training sessions that he attended as part of his job, and he criticized presentations that impacted the functioning of his job. *See Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 364 (6th Cir. 2007) (holding that a canine trainer for a police department who wrote a memorandum criticizing the department's reduction in dog-training hours acted pursuant to his official duties because he was still "carrying out his professional responsibilities" of training dogs).

Plaintiff also emphasizes that he complained about the training sessions and DHS funding to individuals beyond his immediate supervisor, including the CPD Deputy Chief of Police and George Selim, a Policy Advisor at the DHS Office of Civil Rights and Civil Liberties. Yet the "determinative factor" in assessing whether the First Amendment protects an employee's speech is "not where the person to whom the employee communicated fit within the employer's chain of command, but rather whether the employee communicated pursuant to his or her official duties." *Weisbarth*, 499 F.3d at 545. Furthermore, all of the individuals with whom Plaintiff spoke were in some way affiliated with the training sessions. *See id.* (reasoning that an employee's speech to a third-party consultant was still communicated pursuant to the employee's official duties).

Because Plaintiff did not establish the existence of protected activity required for a retaliation claim, we need not address the question of a causal connection. *See Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002) (listing three elements to establish a First Amendment retaliation claim: (1) protected speech by the plaintiff; (2) an adverse action taken against the plaintiff; and (3) a causal connection between the protected speech and the adverse action). As such, Plaintiff's First Amendment claim fails.

### D. Denial of Motion for an Adverse Inference

At oral argument on the motions for summary judgment, Plaintiff moved for an adverse inference based on the destruction of evidence, citing ODPS's failure to retain documents that should have been public record, such as Plaintiff's resume, his handwritten application, and ODPS's complete background investigation, including Plaintiff's professional references.

A party seeking an adverse inference regarding the destruction of evidence must demonstrate that the party in control of the evidence (1) was obligated to preserve it at the time it was destroyed; and (2) destroyed the evidence "with a culpable state of mind"; and (3) that the destroyed evidence was relevant to the claim or defense of the party seeking the inference. *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (citation omitted). Because district courts have broad discretion to craft proper sanctions for the spoliation of evidence, we review a district court's decision not to impose sanctions for an abuse of discretion. *Adkins v. Wolever*, 692 F.3d 499, 503 (6th Cir. 2012). The district court below denied Plaintiff's motion because he failed to establish the second element of the claim, reasoning that "Plaintiff has not shown . . . that ODPS destroyed the records with a culpable state of mind" and that "there is a disputed issue of material fact that ODPS ever possessed the resume in the first place."

Although Plaintiff proffers several facts as evidence that ODPS culpably destroyed the evidence sought, we need not address Plaintiff's culpability argument because he cannot establish the first element of the adverse inference test: whether ODPS was obligated to preserve the evidence sought at the time it was destroyed. "An obligation to preserve may arise when a party should have known that the evidence may be relevant to future litigation, but, if there was no notice of pending litigation, the destruction of evidence does not point to . . . intentional destruction." *Beaven*, 622 F.3d at 553 (citations and quotations omitted). *See also Johnson v. Metro. Gov't of Nashville & Davidson Cnty.,* 502 Fed. App'x 523, 532 (6th Cir. 2012) ("[T]he obligation element is met where a defendant knows evidence might be relevant to future potential litigation.").

Plaintiff gives no date as to when Defendants intentionally destroyed or negligently lost the documents sought. While those documents allegedly came into ODPS's possession in Fall 2005, the earliest ODPS would be on notice for potential litigation was April 2010, when *The Jawa Report* publicly revealed Plaintiff's negative employment history. But ODPS may have destroyed or lost these documents long before receiving notice of that potential litigation. Therefore, without more evidence, Plaintiff cannot meet his burden for an adverse inference. *See Ross v. Am. Red Cross*, 567 F. App'x 296, 302 (6th Cir. 2014) (affirming the denial of a motion for an adverse inference where the movant did not point to evidence demonstrating the defendant's awareness of potential litigation prior to the date it received a letter from the movant's attorney). Accordingly, the district court did not abuse its discretion in denying Plaintiff's motion for an adverse inference.

**E. Denial of Motions to Compel Discovery**

At various points throughout the controversy resulting in Plaintiff's termination, Defendants sought the advice of legal counsel. First, after reporters contacted ODPS with inquiries about Plaintiff's employment history, Director Vedra and Heather Reed-Frient, in-house counsel for ODPS, met with Plaintiff in April 2010 to discuss Plaintiff's time at Columbus State and to prepare a response for the media. Second, when Botos began her investigation into Plaintiff's previous misconduct, she contacted Reed-Frient, as well as ODPS in-house counsel Krista Weida and Josh Engel, about making public records requests in order to obtain documents from Columbus State. Finally, Reed-Frient attended the June 2010 meeting Director Stickrath held to discuss Plaintiff's discipline.

Plaintiff filed a motion to compel the discovery of (1) the communications at the April 2010 meeting; (2) the communications at the June 2010 meeting; and (3) the deposition of Reed-Frient, Weida, and Engel concerning the documents they sought from Columbus State.

The magistrate judge issued an initial opinion and order denying Plaintiff's motion as to the communications during the April 2010 meeting, concluding that the attorney-client privilege protected those communications because the record indicated that the purpose of the meeting was for Reed-Frient to ask Plaintiff questions in order to legally advise ODPS on how to respond to media inquiries. Regarding the June 2010 meeting, however, the judge ordered Defendants to submit for *in camera* inspection an affidavit setting forth the substance of communications during that meeting. Finally, the judge ordered the parties to brief whether *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), a case that articulated a test for when parties can depose opposing counsel, applied to the deposition of the three ODPS attorneys.

After reviewing the supplemental materials, the magistrate judge denied Plaintiff's motion on the remaining two points. First, relying on the *in camera* review of an affidavit supplied by Reed-Frient, the judge determined that the privilege applied to communications during the June 2010 meeting because Reed-Frient's affidavit revealed the primary purpose of that meeting was to obtain legal advice for ODPS concerning the results of Plaintiff's investigation and termination. The judge further held that *Shelton* foreclosed the deposition of ODPS's attorneys "[i]n light of counsel's involvement in this action well before it blossomed into a lawsuit, as well as the danger that the depositions would expose counsel's litigation strategy." Plaintiff filed objections to both of the magistrate judge's orders. The district judge reconsidered Plaintiff's claims and denied his motion to compel, adopting the magistrate judge's reasoning on all points.

### 1. Attorney-Client Privilege

The attorney-client privilege applies "[w]here legal advice of any kind is sought." *Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998). "Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). When a communication involves both legal and non-legal matters, we "consider whether the predominant purpose of the communication is to render or solicit legal advice." *Id.* at 420. This predominant purpose "should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer." *Id.* at 420-21.

### a. Communications at April 2010 Meeting

In challenging the assertion of privilege over the April 2010 meeting between Plaintiff, Director Vedra, and Reed-Frient, Plaintiff argues that "ODPS failed to provide any evidence that Reed-Friend interviewed [Plaintiff] in order to provide legal advice."

As the district court correctly concluded, "the record indicates that the purpose of the [April 2010] meeting was for ODPS to seek legal advice regarding media inquiries into Plaintiff's employment and termination from Columbus State." The district court relied on two pieces of evidence in making that determination. First, Director Vedra stated in his deposition that the media inquiries were "enough of an issue" that he needed to "consult with legal and go from there." Second, Plaintiff stated in his deposition that at the April 2010 meeting, Reed-Frient told him that she wanted to understand the circumstances surrounding Plaintiff's termination from Columbus State in order to help ODPS prepare a response to those inquiries.

Plaintiff disputes whether seeking advice for a response to the media is considered "legal advice" in the first place, although he recognizes that this circuit has not addressed the issue. Plaintiff cites several district court cases that deemed an attorney's advice about media relations to be non-legal. *See, e.g.*, *In re Chevron Corp.*, 749 F. Supp. 2d 141, 167 (S.D.N.Y. 2010) (holding that an attorney's communications were not privileged when "substantial evidence" suggested his predominant role was "not the rendition of professional legal services, but politics, lobbying, and media and public relations"); *City of Springfield v. Rexnord Corp.*, 196 F.R.D. 7, 9 (D. Mass. 2000) (finding that an attorney's documents "prepared in anticipation of media inquiries" were not privileged). However, as the district court noted in denying Plaintiff's objections to the magistrate judge's order:

> The present case is distinct from the cases that Plaintiff cites because the principal purpose of the April 2010 meeting was for Attorney Reed-Frient to gather

> information so that she could advise her client on how to respond to the matter. She was not merely involved in making a business or media decision, but rather sought to advise her client on how to respond to media inquiries into Plaintiff's employment at Columbus State.

Advising a client on how to respond to media inquiries has important legal implications when that client will issue a public statement about an employee. *See Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 122 (2d Cir. 2013) (involving defamation claim stemming from response to media inquiries). Given the potential for legal liability, Reed-Frient's input on how to draft a media response was essential.

Plaintiff further claims that even if the purpose of that meeting was to render legal advice, Defendants needed to establish that Reed-Frient actually used the information she gathered at that meeting by advising the communications department on how to respond to the media inquiries. But the privilege protects communications "necessary to *obtain* legal advice." *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002) (citation omitted and emphasis added). No caselaw suggests that communications are privileged only when they are *utilized* to dispense legal advice.

Plaintiff also asserts that he personally had no reason to believe that Reed-Frient collected information in order to provide legal advice. In order for the privilege to attach to communications between in-house counsel and an organization's employee, the employee must be "sufficiently aware" that he or she is being questioned in order to provide the organization with legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981). As explained above, however, Plaintiff's own deposition testimony indicates that he was aware Reed-Frient, a lawyer, was present to gather information in order to advise ODPS on how to respond to the media inquiries, an act with great legal ramifications. Accordingly, the district court did not abuse its discretion in denying Plaintiff's claim.

### b. Communications at June 2010 Meeting

Plaintiff argues that the attorney-client privilege did not cover communications that occurred at the June 2010 meeting because the purpose of the meeting was to make a business decision concerning Plaintiff's employment and discipline, not to render legal advice. But the magistrate judge made a finding of fact that "the purpose of the meeting was to secure [Reed-Frient's] legal advice related to the results of the administrative investigation," crediting an affidavit supplied by Reed-Frient *in camera* that detailed the substance of the discussion at that meeting and clarified Reed-Frient's role as a legal advisor. The district judge relied on the magistrate judge's factual finding in concluding that the privilege applied to communications during the June 2010 meeting.

Plaintiff alleges that Director Stickrath's deposition testimony contradicts Reed-Frient's affidavit. For instance, Director Stickrath stated that the "[p]urpose of the meeting was to talk about the investigation of [Plaintiff] and the decision to be made in terms of any discipline." Furthermore, Director Stickrath did not "recall" whether the meeting was for purposes of litigation or whether legal counsel was present at that meeting. However, the district court had the record at its disposal, including Director Stickrath's deposition, and still decided to credit Reed-Frient's affidavit. "A district court is in the best position to weigh the evidence and evaluate witness credibility[.]" *United States v. Preciado*, 336 F.3d 739, 747 (8th Cir. 2003).

Plaintiff further contends that even if Reed-Frient attended the meeting to provide legal advice, her presence did not immunize *all* communications that occurred at the meeting. Plaintiff's reliance on *Marten v. Yellow Freight Sys., Inc.*, No. CIV. A. 96-2013-GTV, 1998 WL 13244 (D. Kan. Jan. 6, 1998), is misplaced. There, the court found that the minutes of an Employee Review Committee ("ERC") meeting attended by counsel were non-privileged

because "[t]he primary function of the committee" was to decide "what employment action to take against an employee." *Id.* at *8. Any legal advice sought or received during the meeting was "incidental to considerations of what is most prudent for the successful operation of the business." *Id.* The court further emphasized that "[a]s a voting member of the ERC . . . [counsel] was not acting merely as an attorney rendering legal advice." *Id.* When counsel voted, he went beyond simply providing legal advice and instead "perform[ed] an act of the business. *Id.*

The district court properly found *Marten* distinguishable because "Reed-Frient was not part of a committee to determine Plaintiff's employment status, . . . and was only brought into the meeting after Plaintiff had been represented by counsel in previous disciplinary proceedings." *Rush v. Columbus Municipal School District*, No. 99-60910, 2000 WL 1598021 (5th Cir. Sept. 28, 2000), is on point. The plaintiff in *Rush* sued his employer, a school district, alleging racial discrimination after being repeatedly denied an assistant principal position. *Id.* at *1. The district court denied the plaintiff's motion to compel the disclosure of conversations held during an executive session of the school board on the basis of attorney-client privilege. *Id.* The Fifth Circuit held that the district court did not abuse its discretion in making that determination, reasoning that just as the privilege protected full and frank discussions to facilitate legal advice between a corporation and its attorneys, "[s]imilar policy dictates encouraging full communication between a school board and its counsel." *Id.* at *2. The court noted:

> The [school] District's attorney participated in all the executive sessions, at each of which the Board discussed the legality of refusing to rehire [the plaintiff]. There is nothing in the record indicating that any of the communications was for purposes other than the procurement of legal advice. While the Board members did discuss their reasons for refusing to rehire [the plaintiff], the discussions occurred in the context of inquiring about the legality of those reasons.

*Id.* The court thus concluded that "the attorney-client privilege protects all communications during a meeting between a school board and its attorney for the purpose of obtaining legal advice, even those communications not addressed directly to the attorney." *Id.*

Just as the privilege applied to all the communications during the school board executive session in *Rush* because the primary purpose of that meeting was to obtain legal advice, the privilege similarly covers all communications from the June 2010 meeting because its purpose was to acquire legal advice. Although Director Stickrath's testimony suggests that the primary purpose of the June 2010 meeting was to provide business advice instead of legal advice, the district court did not abuse its discretion in relying on the magistrate judge's determination, which credited Reed-Frient's affidavit, that the primary purpose of the meeting was to provide ODPS with legal advice.

### 2. Deposition of In-House Counsel

This circuit has adopted the so-called "*Shelton* rule," which states that a party can depose opposing counsel only where it has "shown that (1) no other means exist to obtain the information . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002) (quoting *Shelton*, 805 F.2d at 1327).

The litigation in *Shelton* stemmed from the death of a child in a "rollover" car accident, and the case involved the attempted deposition of in-house counsel for an automotive company to inquire about the existence of documentation of rollover tests and accidents held by that company. 805 F.2d at 1324, 1325 n.2. The Eighth Circuit determined that the party seeking deposition could not satisfy the governing test. *Id.* at 1327. But Plaintiff argues that the district court erroneously applied the *Shelton* test to pre-litigation matters involving three ODPS

attorneys—attempts to obtain documentation from Columbus State about Plaintiff's former employment. Plaintiff claims that the district court improperly relied on *Massillon Management v. Americold Realty Trust*, No. 5:08CV0799, 2009 WL 614831 (N.D. Ohio Jan. 21, 2009), to make that determination.

The plaintiff in *Massillon Management*, the owner and operator of a commercial property, sought to depose the defendant tenant's in-house counsel as to pre-litigation matters in a dispute over a commercial property lease. 2009 WL 614831, at *1. The defendant objected, asserting that *Shelton* applied to the deposition of in-house counsel. *Id.* The *Massillon Management* court first determined that *Shelton* squarely applied to the deposition of in-house counsel: "Given that the *Shelton* case itself . . . developed and applied the heightened standard to a deposition of an opponent's in-house attorney, it could not be clearer that the standard was intended to apply to in-house attorneys engaged by the opposing party with involvement in the matter being litigated." *Id.* at *4. The court then concluded that the plaintiff could not depose the defendant's in-house counsel because the attorney played a role in the ensuing litigation. The defendant's counsel bore "responsibility for planning and directing all aspects of the company's legal affairs, overseeing all of its litigation, and providing legal advice to the company's various departments." *Id.* at *5. Moreover, he was involved with the lease at issue from the beginning, negotiating and drafting some of its terms, as well as advising the plaintiff on related legal issues. *Id.* The counsel was also told "early on" that litigation could ensue if the matter was not resolved. *Id.* Consequently, the court determined that the in-house counsel was "intimately involved in this dispute since well before it blossomed into a lawsuit, and has played an integral role in developing Defendant's litigation strategy." *Id.*

Plaintiff attempts to distinguish *Massillon Management*. He argues that unlike counsel in that case, who played "an integral role in developing litigation strategy prior to and during the course of litigation," counsel for ODPS did not develop litigation strategy, but merely assisted Botos in obtaining public records requests from Columbus State to aid in her investigation of Plaintiff.

The district court did not abuse its discretion by applying *Massillon Management* to the facts below. Similarly to the in-house attorney in *Shelton* and *Massillon Management*, OSPS's three attorneys gathered documents about Plaintiff from Columbus State in order to conduct an administrative investigation, something that could give rise to a legal dispute. As the district court correctly noted:

> Attorney Reed-Frient provided legal advice to ODPS regarding the decision to terminate Plaintiff, which the court found to be sufficient in *Massillon Management*. Further, the other two attorneys who Plaintiff seeks to depose were involved in acquiring and handing documents related to the investigation that led to Plaintiff's termination, which the court in *Shelton* found to be sufficient involvement.

Reed-Frient was involved in gathering documents from Columbus State as well.

Finally, Plaintiff argues that unlike in *Shelton* or *Massillon Management*, he did not attempt to depose opposing counsel in order to obtain information about litigation strategy or privileged communications, but rather to gather information about documents ODPS obtained from Columbus State. This is not a meaningful distinction. First, *Shelton* itself involved a deposition that sought information about documents in-house counsel possessed. 805 F.2d at 1325 n.2. Second, the possession of certain documents may be integrally tied to the litigation process. "In cases that involve reams of documents and extensive document discovery, the selection and compilation of documents is often more crucial than legal research." *Id.* at 1329.

This case, like *Shelton*, involved attorneys who obtained documents in relation to potential litigation. Accordingly, Plaintiff's argument fails.

### III.

For the foregoing reasons, we **AFFIRM** the decision of the district court in all respects.

**CLAY, Circuit Judge, dissenting.** In order to survive summary judgment on a mixed-motive discrimination claim, a plaintiff need only introduce sufficient evidence for a reasonable jury to conclude that (1) "the defendant took an adverse employment action against the plaintiff," and (2) "race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). The plaintiff's task is "not onerous," and summary judgment should only be granted to the defendant when "the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* at 400 (emphasis added). This relatively insignificant burden, which is lesser than what a plaintiff pleading a different type of discrimination claim might face, is counterbalanced by the limited relief available for mixed-motive claims. *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010). "[T]he ultimate question is whether [Alomari] presented evidence, *direct or circumstantial*, from which a reasonable jury could logically infer that [his] [national origin] [was a] motivating factor[] in [OHS's] decision to terminate [his] employment." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (emphasis added). Alomari appears to have satisfied this burden.

This case is riddled with factual disputes. Alomari's testimony, along with that of former OHS Director Overly, supports Alomari's claims of an innocent explanation for the omissions on his application—namely, that Alomari was directed to incorporate only the most relevant employment history because the application was merely a "formality," and OHS had previously received Alomari's complete resume when he first applied for the contractor position. Also in dispute is whether Alomari was actually fired from Columbus State Community College—although the settlement agreement on the record should likely settle that dispute. Further, there is a legitimate question as to what OHS Director Vedra actually meant when he communicated

his desire to announce to the community "that you're in America" in connection with his selection of Alomari's replacement. Significantly, there is the prototypical, difficult to resolve on-the-record, factual dispute involved in every mixed-motive claim: whether the employee's protected characteristic played a role in the employer's decision to take the adverse employment action. *See Spees*, 617 F.3d at 389 ("Inquiries into what motivated an employer's decision are very fact intensive and will generally be difficult to determine at the summary judgment stage." (internal quotation marks omitted)).

Defendants argued that Alomari's alleged impropriety—failing to disclose that he resigned under less than auspicious circumstances—is worse than Martin's impropriety of lying about having attended college. The majority bolsters this argument by interpreting ambiguous hearsay to find that Vedra treated Martin more favorably because whether Martin's degrees were bogus was of little consequence to him. Even if the majority has correctly identified one of Vedra's motivations for treating Alomari less favorably, Alomari's claim would not be foreclosed. "Mixed-motive" means that Defendants could still be liable even if Vedra had many legitimate reasons for taking the adverse action, so long as one of his reasons was the unlawful consideration of Alomari's Arab heritage. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (2003). Deputy Director Mack, Alomari's direct supervisor, informed Vedra that the agency needed to treat Alomari and Martin alike because they were both deceiving the agency on their employment applications. Mack believed, based on the constant harassment and negative attention being drawn to OHS due to Alomari's ethnicity and outreach to the Muslim community, that the decision to investigate Alomari and not Martin was influenced by the fact that Alomari was an Arab-American. It should be the fact-finder's task to determine whether Mack's belief was reasonable and supported by evidence.

Factual disputes cannot be resolved on summary judgment. Moreover, "the evidence—all of the evidence—[must] be viewed in the light most favorable to the nonmoving party." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001). Because Alomari has proffered sufficient evidence to justify submitting the non-trivial factual disputes to the jury, I respectfully dissent.